McINTOSH v. MINER et al.

(Supreme Court, Appellate Division, First Department. February 10, 1899.)

1. THEATRICAL CONTRACTS—DURATION—INDEFINITENESS.
  A theatrical contract of management, to exist for three seasons, which were to commence at a certain time, and "continue as long as the same may be mutually agreed upon," is too indefinite to be enforced.

2. CUSTOMS—DURATION OF THEATRICAL SEASON.
  Where an actor testifies that he asked a great many people what a theatrical season is, and that they were unable to say, subsequent testimony that he is sure the season is 32 weeks is no evidence of a custom to that effect.

3. EXECUTORY CONTRACTS—BREACH—WHAT CONSTITUTES.
  To constitute a breach of an executory contract, the promisor must clearly repudiate the contract, either by word or by act.

4. Same—Rescission by Agreement—Consideration.
　　Before the time arrived for performing a contract, the parties agreed
　　that a sum should be paid to one party by the other, and the contract
　　canceled. *Held*, that there was a rescission based on a sufficient consid-
　　eration.

5. Same—Sealed Contracts.
　　A contract under seal may be rescinded by parol.

　　Appeal from trial term, New York county.

　　Action by Burr W. McIntosh against Henry C. Miner and another.
From a judgment entered on a verdict in favor of plaintiff, defendants
appeal. Reversed.

　　Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTER-
SON, O'BRIEN, and INGRAHAM, JJ.

　　A. H. Hummel, for appellants.
　　John Larkin, for respondent.

　　INGRAHAM, J.　The parties to this action made a contract, dated
February 1, 1896, by which Miner and Brooks, the defendants, agreed
to assume the management of the plaintiff as a star in a theatrical
company to be organized by them for the seasons of 1896–97, 1897–98,
1898–99, and the plaintiff agreed to render services as star under the
defendants' management in the said company upon the terms and con-
ditions specified in the contract.　The defendants agreed to pay the
plaintiff $100 per week as compensation for his services, and "a sum
equal to twenty-five per cent. of the net profits made for the first
season, and thirty-five per cent. of the ensuing two seasons."　The
first season under the agreement was to commence "some time in the
month of November, and the two ensuing seasons some time in the
month of September, and to continue as long as the same may be mutu-
ally agreed upon."　The defendants were to engage the members of
the company, make the route, and select the plays that were to be
performed.　The plaintiff agreed not to render professional services
between November 1, 1896, and July 1, 1899, except in the state of
Nevada, without the written consent of the defendants.　The com-
plaint alleges that the plaintiff performed all the conditions of the con-
tract on his part, and has been ever ready and willing to perform the
same, and has demanded from time to time of the defendants to com-
plete and perform the contract entered into by them on their part,
but that the defendants have neglected and refused to perform the
same or any part thereof.　The allegations as to the performance by
the plaintiff and the breach by the defendants are denied by the answer.

　　The court charged the jury that the plaintiff was entitled to recover
his damages, as in the case of a breach of contract for his employment.
The jury found a verdict for the plaintiff.　The defendants insisted in
the court below that the contract contemplated another agreement be-
tween the parties, by which the term of each season was to be fixed,
and that in its present condition it was too indefinite to be enforced,
and on that ground moved to dismiss the complaint, and excepted to
the denial of such motion.　The only provision in the contract as to
the duration of the season was contained in the sixth clause, which pro-
vided that the first season under the agreement should commence

some time in the month of November, and the two ensuing seasons some time in the month of September, and should continue as long as the same might be mutually agreed upon.    Thus, by the contract, the defendants were to act as the plaintiff's manager for three seasons. The contract varies from that usually presented by which the engagement is either for a season, its duration to be ascertained from a custom or usage in the profession to which the parties belonged, or for a definite number of weeks or months.    Here the contract contemplated a season the duration of which was not fixed, either by a reference to the custom and usage in the profession, or by the express terms of the contract, but was to be fixed by a subsequent agreement.    The plaintiff alleged in the complaint that the season referred to in the contract was understood and agreed by the parties to be the usual theatrical season, consisting of 32 weeks, unless otherwise extended or continued by mutual agreement.    This allegation is contradicted by the terms of the contract, which provides that the season shall continue so long as the same may be mutually agreed upon; but there was not evidence to show a usage or custom in the profession to which the parties belonged by which a theatrical season continued for 32 weeks.    The only evidence on this subject was the plaintiff's testimony.    He was asked:  "Will you tell the jury what is the usual length of a theatrical season in the city of New York?"    The witness attempted to answer, "That is a question which—" when he was interrupted by his counsel, and, after a question objected to, the witness continued:  "I have asked a great many people during the last two or three weeks what their idea of a theatrical season is, and in no instance have they been able to give it."    The court then said:  "What we want to know, if there is such a thing, is what is the usual theatrical season."    Counsel for the plaintiff then asked this question, "What is the usual theatrical season in the city of New York, as it is generally understood in the theatrical profession, not taking in occasional cases?"—to which plaintiff replied, "I am quite sure it is thirty-two weeks."    This was not sufficient to show that there is a custom which can be presumed to have been intended by the parties as the term for which the employment was to continue in the absence of a subsequent understanding. When asked as to his knowledge of such a custom, all that he had to say was, "I have asked a great many people during the last two or three weeks what their idea of a theatrical season is, and in no instance have they been able to give it."    That would tend to show that there was no such custom.    The fact that the witness was willing to swear that he was sure it was 32 weeks is no evidence that other persons were sure of it, or that 32 weeks was recognized as a theatrical season. We have, therefore, a contract whereby the defendants agree to act as manager for the plaintiff, and to pay him $100 a week for a season, the duration of which was to be determined by a subsequent agreement.    No such agreement was made, and no evidence was produced to show that there was a custom or usage in the profession to which the parties belonged by which a season was understood to be any particular period.    It is difficult to see how the court could enforce such a contract, or upon what basis the damages could be ascertained in case of a breach.

As was said by the presiding justice in Nicholls v. Granger, 7 App. Div. 113, 40 N. Y. Supp. 99:

"Where the parties contemplate by their own actions in a formal agreement to make that certain which is uncertain in an informal agreement, which is not intended to be the final agreement, there is nothing which the court has any jurisdiction to enforce. * * * They provided for the execution of an agreement which should contain other provisions than those contained in the informal agreement of August 10th. Under these circumstances, the paper is to be treated as nothing but a step in a negotiation looking to a final settlement."

I also think that the allegation of the complaint that there was a breach of this contract by the defendants was not sustained by the evidence. Up to the interview in the street between the plaintiff and Brooks, in October, it would seem that the defendants were engaged in making preparations to carry out the contract. They had procured the play to be written for the company of which the plaintiff was to be the star, and the plaintiff was assured that the defendants would be ready in the month of November, when the season was to commence. At that meeting the first suggestion that the contract was not to be performed came from the plaintiff, and it was in relation to that suggestion that Brooks invited the plaintiff to a subsequent interview. The plaintiff testified that Brooks, at such subsequent interview, said to him: "Mr. Miner does not want to stand in your way, and, if you wish to get other employment, why you may do so." It was in answer to this statement that the plaintiff proposed that the existing contract be canceled by the payment to the plaintiff of $400. The plaintiff says that Brooks refused such offer. Brooks says he accepted it, and agreed to send the $400 to the plaintiff as soon as he could see Mr. Miner. Certainly, at the end of this interview there was no statement by the defendants that they did not intend to carry out the contract which was to last for three years, and contemplated the organization of the company for three successive seasons. The letter in which the plaintiff returned the check simply stated that the writer of the letter had been misinformed as to what took place between himself and Brooks, and then stated that his attorney had communicated with the defendants as to their conduct under the contract. The fact appears that the plaintiff did not play under the management of the defendants for the past seasons; but, from the testimony, the plaintiff was as much in default as the defendants.

In the cases where an action for damages for a breach of a contract, prior to the time of its performance, has been sustained, it has appeared that the promisee has clearly repudiated the contract, announcing his determination not to perform, or that some act of his has rendered performance impossible. Thus, in Johnstone v. Milling, 16 Q. B. Div. 460, the lessor covenanted in the lease to rebuild the premises after the expiration of the first four years of the term, upon a six-months notice from the lessee requiring him to do so. Before the expiration of the first four years of the term, the lessor, on many occasions, told the lessee that he would be unable to procure the money for rebuilding the premises. It was held that the plaintiff could not recover unless there was a breach of contract

by anticipation, by reason of a wrongful repudiation of its covenants by the lessor before the time of performance arrived; that what had been said by the lessor did not, under the circumstances of the case, amount to such a repudiation. And in the case of New England Iron Co. v. Gilbert M. E. R. Co., 91 N. Y. 162, it was held that, to establish a breach of an executory contract, the obligations of the contract must be expressly repudiated, or the acts of the parties must be so inconsistent with its performance that such express repudiation can be presumed.

It is also claimed by the defendants that at the interview in October there was a mutual rescission of the contract, by which, for a valuable consideration, the plaintiff agreed to abrogate it, and that it was in consequence of this agreement that the contract was not performed by the defendants. That defense was overruled in the court below, the defendants requesting the court to submit to the jury the question as to whether there was such an agreement. This the court refused, and the defendants excepted. I think this ruling was error. The plaintiff testified: That at this interview Brooks said: "I have had a talk with Mr. Miner. Mr. Miner does not wish to stand in your way, and, if you wish to get other employment, why you may do so." To that the plaintiff replied: "That is a little bit of a staggerer just now, but, if I do agree to this, will you give me four weeks' salary, being at the moment under great stress?" And that Brooks refused this offer. Brooks testified that at this interview, the first week of October, 1896, the plaintiff told him that he could get other employment, and that he desired, if possible, to cancel this contract; that he told the plaintiff to come in and see him the next day; that "he came to see me the next day, or the day after, in my office, 1193 Broadway. Mr. McIntosh said that he did not want to embarrass Mr. Miner or myself. He had understood that I was ill,—that we could not go on with various things,—and I admitted the fact, and in consequence of my sickness, that had caused all this difficulty. He said, 'Very well, then, to make the matter short, if you will give me four weeks' salary I will cancel the contract.' I told Mr. McIntosh that that would be all right; as soon as I could see Mr. Miner a check would be sent to him. In reply to that he said, 'Good morning,' among other pleasant things, and left the office." The witness further testified that the defendant Miner was at that time in Chicago; that, as soon as Miner returned, a check for $400 was sent to the plaintiff, with a letter by which it was stated that, upon Miner's return from Chicago, he had been informed of the plaintiff's propositions that Miner and Brooks pay him $400, the plaintiff to cancel the contract, which was accepted by Brooks; that he (Miner) had ratified Brooks' agreement by signing an inclosed check, which he directed to be forwarded to the plaintiff.

The question presented is whether this was a valid rescission of the contract. The rule is stated in 3 Am. & Eng. Enc. Law (1st Ed.) 389, as follows:

"An executory contract—that is, one which has not been acted upon—may be discharged by the simple agreement of the parties that it shall no longer

bind either of them. The consideration for the promise of each party is the renunciation by the other of his rights under the contract. Each abandons his right in consideration that the other will do the like. It must be shown that the agreement was mutual, and not a mere waiver of his right by one party."

We have in this case evidence tending to show that this executory contract, before the time for its performance, and at a time when the defendants could have performed it, was rescinded by an agreement between the parties, made at the request of the plaintiff, that the contract be canceled, and that the defendants agreed to pay to the plaintiff the sum of $400. At the time this new agreement was made, there was no indebtedness by the defendants to the plaintiff. The original contract was yet to be performed, the time of performance not having arrived. If such a contract was actually made by which the defendants became indebted to the plaintiff in the sum of $400, I can see no reason why it would not be a rescission of the prior contract. As before stated, there was evidence to sustain the finding of the jury that such an agreement was actually made. The plaintiff testified that he proposed such an agreement. Brooks testified that he accepted it. This was in the first week of October, while the defendants had the whole month of November before they would be in default. It is true the contract in suit appears to be under seal; but it is now settled in this state that a new agreement by parol or without a seal is sufficient to abrogate a prior agreement under seal. It was so held in the case of McCreery v. Day, 119 N. Y. 9, 23 N. E. 198, when it was said: "So also, a new agreement, although without performance, if based on a good consideration, will be a satisfaction, if accepted as such." Here the consideration consisted in the promise of the defendants to pay to the plaintiff the sum of $400, and to release the plaintiff from his obligation to preference. In Morehouse v. Bank, 98 N. Y. 509, it is said that, "if one having a debt or claim against another satisfies or releases it in consideration of an executory promise by the party owing the debt or duty, he cannot afterwards enforce his original cause of action upon a mere failure by the other party to perform his promise, 'for he has a remedy to compel performance.'"

This new contract is not pleaded as an accord and satisfaction of an existing obligation to pay a sum of money, but as an agreement to rescind an executory contract by a new contract, the obligations of which are assumed by the respective parties; and I can see no reason why that new contract is not valid, based upon a sufficient consideration, capable of enforcement, by which the former contract between the parties was abrogated. It all depends upon whether such a contract was made; and there was evidence to sustain a finding of the jury that such a contract was made. That question, therefore, should have been submitted to the jury.

I think the judgment should be reversed, and a new trial ordered, with costs to the appellants to abide the event.

McLAUGHLIN, J., concurs. VAN BRUNT, P. J., concurs on first ground. PATTERSON, J., concurs on second and third grounds.

O'BRIEN, J. There was evidence of breach of contract by defendants, and the court below, without objection, presented the case to the jury on the theory of such breach. That point was not suggested on the trial, nor urged on this appeal, the defendants acquiescing in the view taken by the learned trial judge on the question of the breach by defendants.. We should not therefore consider further the question of a breach, for it is not presented on this appeal for the purpose of reversing a judgment. Upon the ground that there was evidence to go to the jury on question of a new agreement to cancel. the old on payment of $400, I concur in result.