(37 App. Div. 564.)

### ARNOLD et al. v. R. ROTHSCHILD'S SONS CO.

(Supreme Court, Appellate Division, First Department.   February 24, 1899.)

LEASE—AGREEMENT TO MAKE CONTRACT.

    A broker, having authority of a prospective lessee "to close the lease" of a "store" at a certain rental, submitted an offer of said sum for the "store and basement" to the prospective lessor, who stated that he would rent at that sum, and authorized the broker "to close the lease." The broker then wrote the lessee that he had closed the lease for "store and basement," receiving a reply that it was satisfactory. On the same day he prepared to draw a lease of ordinary form. The lessee never took possession. *Held*, that there was no lease, but merely an agreement for a lease.

    Barrett, J., dissenting.

Appeal from trial term, New York county.

Action by Milton S. Arnold and others against the R. Rothschild's Sons Company. From a judgment entered on a dismissal of the complaint, and from an order denying a new trial, plaintiffs appeal. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

Herbert R. Limburger, for appellants.

Mark M. Schlessinger, for respondent.

RUMSEY, J.   The action was brought to recover two installments of rent claimed to be due to the firm of Morris Arnold & Co. upon a lease by which Arnold & Co. let to the defendants a store in the city of New York. The defendants, who had never taken possession of the store under the alleged lease, denied that any lease had ever been made between the parties, and the question presented was only whether a completed lease had ever been made. No evidence was given by the defendants, and the case stands solely upon what was proved by the plaintiffs' witnesses. At the close of the plaintiffs' case the learned justice who presided at the trial held that, upon the facts shown, no lease was ever concluded between the parties, but that the agreement sworn to was simply a contract to make a lease, which had not yet been completed, and for that reason he dismissed the complaint. Whether that ruling was proper is the only question presented upon this appeal.

The evidence showed that the principals in the transaction never had any consultation with regard to the making of the lease, but all negotiations, so far as there were any, were conducted by one Tannenbaum, a broker, who undertook to bring the parties together and complete the agreement; and the case stands solely upon his evidence. It appears that the firm of M. Arnold & Co. were in possession of the building, or a portion of the building, at 472 Broadway, for which they had a lease which expired on the 1st day of February, 1893. The defendant corporation was engaged in business in the city of New York, and, as Mr. Tannenbaum says, desired to rent a store for the purposes of its business. It had had some negotiations upon that subject with Tannenbaum, and in the

early part of January he called at the premises of the defendant, at 1155 Broadway, to talk with its officers about renting a store. Before that they had had in view a store at 543 Broadway, with regard to which they had been conducting some negotiations, which apparently had fallen through. The officers of the defendant, who were conducting its business in New York then, spoke to Tannenbaum about the store occupied by Arnold & Co.; and, as he puts it, he said:

"They said they would take the store of Mr. Arnold, if I could get it for $5,000; and I told him if they put it in the shape of a proposition,—in the form of an offer,—I would endeavor to get it. They said they would take it at $5,000, 'but hurry up; it is late in January, and we want to occupy it the 1st of February.' "

He immediately took a car, and went down to Mr. Arnold's office. The following testimony was then given:

"Q. Did they say anything to you about closing it at $5,000? A. Yes, sir. Q. Tell us what they said about that,—whether they authorized you to close it at $5,000. A. If I could get the other store for $5,000 for one year, they would take it, and they authorized me to close it. The language was, they authorized me to take it at $5,000."

The witness then stated that he went down and saw Mr. Morris Arnold, since dead:

"I said to Mr. Arnold that I had just received an offer of $5,000 for the store. I am saying what I told Mr. Arnold. I said, 'I have just received an offer for $5,000 for your store and basement from R. Rothschild's Sons Company,' handing him the card. He said, 'I ought to get $5,500, which I am paying.' I said, 'Mr. Arnold, it is late in the season; you had better do it. I can get you a store for $1,800 which will suit you.' He said, 'Are you sure?' I said, 'Yes, sir.' He said, 'On that statement, I will rent the store for $5,000 to the 1st of February.' He said he would rent it for one year for $5,000. He authorized me to close it then."

After some further conversation, the witness said, "He said, 'If that is the case, you can close the lease.' " This took place on the 9th of January, 1892. On returning to his office, Tannenbaum wrote, and sent by a messenger, the following letter to the defendants, dated on that day: "Gents: I have closed the lease for you as directed, with Mr. Arnold, for store and base., 472 Broadway, for one year from February first, 1892, at $5,000 rental, payable monthly. Yours, truly, Leon Tannenbaum." The messenger who delivered that letter brought back a scrap of paper upon which was written the following: "Mr. T.: Yours received. Mr. R. is satisfied. Yours, etc., A. M. Rothschild." Tannenbaum further testified that on the same day, at a later hour, he caused to be sent to the defendants a letter in which he asked them to inform him by return mail under what state law the company was organized, and the individual names of its officers. He testified that he wrote this letter after his return from having his conversation with Arnold, for the purpose of getting the information to enable him to draw a lease, and that he intended to draw a lease in the ordinary and usual form, and the information which he asked from the defendants was for the purpose of embodying the manner in which the lease was to be drawn. It will be noticed that Tannenbaum, at the time of his first direct ex-

amination, in which he stated the conversations between the two parties relating to the lease, does not say that the Rothschilds said anything to him about the manner of paying the rent. His attention having been called to that upon a further direct examination, he said that in his conversations with the Rothschilds it was stated that the rent was to be paid monthly, and, having been asked whether that manner of payment was also mentioned in his conversation with Mr. Arnold, he answered:

"It was his instructions. Q. Both the monthly payment of the rent, the duration of the term, and the amount? A. Yes; I had made his lease originally. Q. And you were going to embody these things in a written agreement, were you? A. Yes, sir."

So it will be seen that, at the time Tannenbaum finished his conversation with Arnold respecting the agreement, he supposed that a formal lease was to be made; and he expected to put into that lease an agreement as to the time of payment of the rent of $5,000, which he said was the same sum agreed upon.

The Rothschilds never took possession of the premises under the alleged agreement. The 9th day of January, 1892, was Saturday; and on the 11th the Rothschilds wrote to Tannenbaum, saying that it would be impossible for them to use the Arnold store. After the receipt of that letter no effort was made by Tannenbaum to procure a written lease, and nothing further was done in that direction. Subsequently, after the first installment of rent had become due, an action was brought for it by these plaintiffs against the defendants, in which, upon a trial, the defendants succeeded, and the judgment entered in their favor was affirmed upon appeal, after having been modified by striking out a statement that it was dismissed upon the merits, and inserting in place of it a statement that it was dismissed with the same effect in all respects as though the defendants' motion to dismiss had been granted at the close of the plaintiffs' evidence; thus making the judgment operate merely as a nonsuit, instead of a final determination of the rights of the parties. Arnold v. R. Rothschild's Sons Co., 23 App. Div. 221, 48 N. Y. Supp. 854. As the case is presented here, the evidence is somewhat different from that presented on the other trial. Therefore the decision of the appellate division upon the facts there appearing cannot be of much assistance to us.

The rule ordinarily is that whether an agreement shall be construed to operate as a lease in præsenti, or only an agreement for a lease, depends upon the intention of the parties, to be collected from the whole contract. Jackson v. Delacroix, 2 Wend. 433. If the agreement contains words of demise in præsenti, or if all the terms of the contract are included in the agreement, and there has followed an actual possession of the premises by the lessee, it would not be difficult to say that the understanding was that an actual lease had been made, and that the contract was not a mere agreement to make a lease in the future. But if all the terms of the contract were not finally agreed upon, or if there is upon the statement of the alleged contract between the parties any unsettled term, or if any of the terms of the agreement are not clear, and if

it is understood between the parties that a formal lease was to be executed, then the contract will be interpreted as an agreement to make a lease, and not as a finally concluded lease which passes to the lessee the right to the possession of the premises, and which vests to the lessor the right to recover the rent. The contract, as testified to, contains no express words of demise by which a present interest passed. That is not claimed. But it is said that authority given to Tannenbaum "to close the lease," which was all the authority either party gave him, necessarily implied that the contract was complete, so far as the speaker was concerned, when Tannenbaum had procured one party to accept the terms offered by the other. We do not think so. When Arnold authorized Tannenbaum to "close the lease," that implied that he should do something yet to make it a complete lease. He had still to "close it." He has told us what that meant when he says that he took at once the slips to prepare a formal instrument to be executed by both parties, and it is clear that he did not suppose that his duty was done until such a paper had been made.

It is claimed by the appellants that if all the terms of the agreement were finally concluded between the parties, so that nothing remained except to reduce those terms to writing and execute the writing, the contract was completed, although it was understood between the parties that a formal lease should be executed. It is quite true that where a valid contract has been made, by which the parties understand that their rights are fixed, such a contract may be enforced, although there may be a stipulation or an understanding between them that a more formal contract shall be executed. Sanders v. Fruit Co., 144 N. Y. 209, 39 N. E. 75. But it is essential to the enforcement of such an informal contract that the minds of the parties should have met upon all the terms as well as the subject-matter of the contract; and if anything is left open for future consideration, or if the subject-matter does not appear to be understood alike between the parties, the informal paper cannot form the basis of an agreement. Nicholls v. Granger, 7 App. Div. 113, 40 N. Y. Supp. 99. It is to be noticed that, according to Mr. Tannenbaum's testimony, the subject-matter of the lease (that is, the premises which were to be leased), did not seem to be understood precisely alike by the defendants and the plaintiffs, or by the defendants and himself. He says expressly that the defendants told him that they would take the store, if they could get it for $5,000. He is equally explicit in saying that the proposition he made to Mr. Arnold was that the defendants would take the store and basement at $5,000. There is considerable difference between these two propositions, and the defendants, having offered to take the store, would not have been called upon to accept a lease of the store and basement; so that, upon the testimony of Tannenbaum himself, it is quite clear that the subject-matter of the contract between the parties had not been finally agreed upon. As the rule requires that, where the complaint has been dismissed upon the testimony of the plaintiff, only the most favorable inferences must be drawn in favor of the plaintiff, it must be assumed, undoubtedly, that at the time

of Tannenbaum's conversation with the Rothschilds he spoke of the fact that the rent was to be payable monthly. But yet it is worthy of consideration that when he was relating, in order as it occurred, the conversation by which the Rothschilds authorized him to negotiate with Arnold, he says nothing about the fact that the rent was to be payable monthly. This illustrates the danger of construing as a completed contract a series of detached conversations had by a broker with principals, in which he is endeavoring to bring them together, before they have had any final agreement between themselves. As every one knows, a formal lease contains many stipulations which are not found in the contract growing out of the conversations which Tannenbaum had with these parties. All those stipulations have an important effect upon the rights of the respective parties, and, when it was understood that such a formal lease should be executed, it would be necessary that the preliminary conversations should be quite full and explicit as to the terms of the contract, before the parties should be held to a completed contract, in the absence of what they had agreed should be the final evidence of such a bargain. In the case of Sanders v. Fruit Co., 144 N. Y. 209, 39 N. E. 75, the contract between the parties was made in writing. All the stipulations which they had agreed upon were fully set out, and the court held that because of that fact they were bound, although they expected to put these formal stipulations into another form. The decision of the court in that case was put expressly upon the ground that it was understood between the parties that the contract was completed by the correspondence between them, and that it was subsequently to be put into a single writing simply for their convenience, and for the purpose of furnishing more satisfactory evidence of the arrangement which had been already finally completed. But in this case not only is it apparent that the subject-matter of the contract was not the same in the minds of both parties, but it is also apparent that it was to be finally put into writing for the purpose of embodying in it other stipulations which are usually embodied in writing of that kind, and which have a considerable effect upon the rights of the parties. Undoubtedly, if, as a result of the conversation which had been had, without any further writing between the parties, the defendants had taken possession of the store and basement, thus indicating the intention of both parties that the final arrangement was completed without any formal lease, a different question would have been presented. But where it appears, as here, that the parties themselves never met, that the whole transaction was conducted by an agent, who leaves the subject-matter of the contract in some doubt, who is not clear in his testimony as to all the terms of the lease, and whose only authority was to close the lease which he himself has interpreted as authority to make a formal lease after the terms of the arrangement had been substantially understood,—the talk had by the agent is not to be construed as the final agreement between the parties, but simply as the negotiations, the result of which was to bring about a meeting of the minds for the purpose of enabling him to reduce the contract to writing when it should have been made. It is quite

true that the learned appellate division of the Second department, in referring to the first letter of Tannenbaum to the defendants, on the 9th of January, and the receipt of it, to which Roths-child's name was signed, said that if, in addition to that, there had been any proof that Tannenbaum had actually seen the plaintiffs, and made the agreement set out with them in his letter, there would be great force in the argument that the transaction amounted to a complete lease. That saying, however, was not necessary to the determination of the case; and it entirely overlooked the fact that the authority to Tannenbaum, given by the defendants, was to negotiate a lease for the store, while the actual lease which he did negotiate was for the store and basement, which is an entirely different thing. It may be said, too, with reference to that paper, that it is merely a declaration by the defendants of what they had done, and it does not purport to be any part of a contract or writing for the purpose of making a contract between the plaintiffs and the defendants. This letter was delivered and the answer received by one McDonald. There was no testimony on his part given to show that the letter was received by either of the Rothschilds who had authority to represent the defendants in this regard, or that it was signed by either of them. He presumed that he gave it to Mr. Rothschild, and the person to whom he handed the letter gave him the answer. But it is not signed by defendants, and he does not pretend to know who signed it. It clearly was not intended by Tannenbaum to represent a contract between the parties, because it contains no stipulations on the part of Arnold, and did not in any way bind him; nor is it executed by Tannenbaum as his agent, or on his behalf. The only legitimate interpretation that can be given to it is that it was written for the purpose of giving to the defendants information as to the result of the negotiation which had been had at that time, so that they might know what to expect with relation to the store for which Tannenbaum had been bargaining in their behalf.

Upon the whole case, we are satisfied that the agreement as testified to by Tannenbaum did not constitute a lease, but was simply an agreement to make a lease, which was subsequently to be reduced to writing; and for that reason neither party incurred any liability to the other as the result of this conversation, and therefore this action cannot be maintained.

The judgment and order appealed from must therefore be affirmed, with costs. All concur, except BARRETT, J., dissenting.

BARRETT, J. (dissenting). I am constrained to differ with my brethren in this case. In my judgment, a prima facie case of a completed agreement in præsenti was made out. There was at least sufficient proof to go to the jury upon the question of a present, completed agreement. It will not do to pick out a single phrase in Tannenbaum's narration, and conclusively predicate thereon a mere inchoate agreement for a lease to be executed in futuro. It is true that Tannenbaum testified that the plaintiff Arnold, at the close of the crucial interview, said to him, "If that is. the case [referring to some previous observations of Tannenbaum's recommending the de-

fendants as tenants], you can close the lease." That expression, however, may have implied, and may well have been understood to mean, "You can now complete the bargain." It did not necessarily mean, "You can draw a lease for our final consideration." At all events, the jury might have looked at it, in connection with Arnold's preceding language, as importing a present agreement, and might have found that the word "lease" was loosely used as a layman's synonym for "renting." As there was a nonsuit, we are bound to place upon the testimony such inferences as are most favorable to the plaintiffs. Arnold's preceding language was this: "On that statement [a statement that Tannenbaum could get Arnold another store for $1,800], I will rent the store for $5,000 to the 1st of February." Tannenbaum added that Arnold said that "he would rent it for one year for $5,000. He authorized me to close it then." Putting it all together, the jury might fairly have inferred, had the evidence been submitted to them, that the formality of an unnecessary written lease was not intended to be a condition precedent to a binding agreement. There was undoubtedly evidence from which the jury might have found that the defendants authorized Tannenbaum to take the plaintiffs' store for them at $5,000 per annum, payable monthly, and to close the transaction on those terms. Armed with this authority, Tannenbaum induced the plaintiffs to agree to let the defendants have the store on such terms; and that, it seems to me, closed the transaction. It was competent for the jury to say that the minds of the parties met, and that the bargain for a year's renting was then complete. Nor can incompleteness well be predicated of a variation between the defendants' offer, as an offer for the store, and the plaintiffs' acceptance, as for the store and basement, for the reason that Tannenbaum immediately notified the defendants by letter that he had closed for the store and basement, and the defendants replied, through A. M. Rothschild, expressing satisfaction. This satisfaction was quite natural, as the defendants thus got more than they had bargained for, not less. It is said that the evidence of the delivery of this letter from Tannenbaum to the defendants, and of A. M. Rothschild's reply expressing satisfaction, is insufficient. But these letters were introduced in evidence without objection, and the defendants did not, either during the trial, or upon their motion for a nonsuit, question the proof on that head. Their point was that the letters, though proved, did not complete the renting. But, further, the jury might fairly have concluded that the defendants' letter to Tannenbaum, in which they state that they "cannot use Arnold's store," resulted from the receipt by them of Tannenbaum's letter, and their knowledge of A. M. Rothschild's reply thereto. It was for the jury to say whether this last letter of theirs was written to stop an unfinished negotiation, or was an attempt to withdraw from the situation in which their previous note, expressive of satisfaction with the bargain, had placed them.

Upon all the evidence adduced, I think there was a question for the jury upon the issue of a completed agreement, and that the complaint should not have been dismissed.