GOLDSTINE and others, Respondents, vs. TOLMAN and others,
Appellants.

*March 19—May 1, 1914.*

*Contracts: Requisites: Meeting of minds: Preliminary agreements:
Incompleteness: Practical construction by parties: Agreement to
lease: Specific performance: Breach by both parties.*

1. Where a contract informal but complete in its terms appears to
   have been made, it will take effect although the parties con-
   template that a more formal one will thereafter be made; but
   writings intended only as preliminary negotiations, to be fol-
   lowed by a formal contract containing material provisions not
   contained in or to be inferred from such preliminary writings,
   will not take effect as a contract.
2. By a "preliminary agreement" the owner of a city lot agreed to
   lease it to plaintiffs for ninety-nine years "on the usual terms
   as applied to a ninety-nine year lease," and plaintiffs were to
   erect a building thereon. Payment of $250 by the plaintiffs
   was recited "for the payment of attorneys' fees, providing this
   lease is not merged into an actual agreement and new lease. If
   it is, they are to have credit for $250." Said agreement, with a
   supplemental agreement, definitely settled some of the main
   provisions of the lease thereafter to be executed, such as the
   term, the rental to be paid, the cost of the new building, the
   time when it was to be completed, the ownership of it at the
   end of the term, and the sum to be advanced by the lessor in aid
   of its construction, but as to many other important matters
   (some of which were referred to in said agreements) made only
   the general provision above quoted. It appears that there was
   no general or usual form for a ninety-nine year lease in use in
   the city where the property was located. After the execution of
   such preliminary agreements, the parties disagreed as to vari-
   ous matters left indefinite therein, and each in turn submitted
   two successive leases embodying his own ideas thereof, differ-
   ing, however, in their terms and containing also modifications
   of some of the definite provisions of the agreements. At the end
   of about six months they were unable to harmonize the points
   of difference and negotiations practically ceased. *Held*, that
   said agreements were tentative only, and that there was no def-
   inite contract upon the terms of which the minds of the parties
   had fully met or of which specific performance could be en-
   forced.

3. In an action for specific performance, brought more than a year and a half after negotiations had ceased and after the defendant owner had spent large sums on repairs and had given a ninety-nine year lease to another person, the trial court held that plaintiffs were entitled to specific performance of the preliminary agreements, and prepared a lease which it held to be in conformity therewith. Such lease differed materially from any of the leases drawn by the parties and submitted to each other as above stated. *Held* that, even assuming that the minds of the parties had in fact met on the terms of the lease prepared by the court, plaintiffs were not entitled to relief, because their failure during the negotiations to state with substantial accuracy the terms of such lease was as much a breach of their obligation as was the owner's like failure a breach of his obligation.

APPEAL from a judgment of the circuit court for Milwaukee county: OSCAR M. FRITZ, Circuit Judge. *Reversed.*

This action was brought to enforce specific performance of an alleged agreement to enter into a ninety-nine year lease, and resulted in a judgment for the plaintiffs. On October 16, 1909, the plaintiffs and the defendant *S. A. Tolman* entered into the following agreement:

"This preliminary agreement certifies that *S. A. Tolman,* party of the first part, and *James A. Silver, Max Goldstine* and *Gustave E. Kahn,* parties of the second part; that party of the first part agrees to lease the property south of the alley facing on Third and Sycamore streets in Milwaukee, Wis., owned by first party, to parties of the second part for ninety-nine years on the usual terms as applied to a ninety-nine year lease, leasing the property for the first fifteen years at $22,500 per year, balance of eighty-four years at $23,500 per year, payable monthly in advance, first party agreeing to rebate the first year during building, $5,000 from the rental parties of the second part are to pay as here specified. Parties of the second part agree to put up a fire-proof building which shall be put up with foundations sufficient to carry ten or more story building and walls to carry that height also, and party of the second part shall give good and sufficient security that they will put up a building to cost not less than $200,000 and any more money required to complete the

building they are to furnish. Party of the first part agrees to loan party of the second part $100,000 for five years at five per cent. per annum. After five years second parties to have option to have loan continued and pay $10,000 on the principal annually until it is paid. Interest on money loaned by said first party payable monthly in advance. Parties of the second part are to have plans and specifications drawn and submit same to the party of the first part for his approval, and no building shall be put up without his approval and he puts in this $100,000 after party of the second part have put in theirs and he as fast as architect's certificates and mechanic's liens are furnished. Parties of the second part shall have the right to purchase the property any time within ten years at $550,000. Parties of the second part shall insure the property at least eighty per cent. of the value of the buildings and in case of fire the same shall be paid to the first party as his interest may appear, and this insurance on the property shall continue to his benefit during the life of the lease, and at the end of the lease term, buildings shall go free to the party owning the fee simple. Party of the second part hereby pays $250 for the payment of attorneys' fees, providing this lease is not merged into an actual agreement and new lease. If it is, they are to have credit for $250. Date of this lease to take effect on the 1st of January, 1910. Parties of the second part having all signed this agreement and are to continue to be responsible to party of the first part for the lease up to the time of full payment of money advanced for the building. Parties of the second part have the right to form a holding company with sufficient responsibility to carry on and make them responsible for the rental of the property and carry out this preliminary agreement; parties of the second part personally signing the notes and lease and being personally responsible to the end of the time when the payment is fully made for money loaned by party of the first part. Lease must be completed and signed not later than November 5, 1909."

On October 20, 1909, the following supplementary agreement was made:

"This agreement, made between *S. A. Tolman* of the city of Chicago, Cook county, Illinois, party of the first part, and

*James A. Silver, Max Goldstine* and *Gustave E. Kahn,* parties of the second part, and as supplemental to the preliminary agreement entered into by said parties on the 16th day of October, 1909, and as though fully incorporated therein.

"The said *S. A. Tolman* agrees to and with the parties of the second part that the said long-term lease shall contain a provision that in case of default of the lessees under said lease, lessees shall be entitled to thirty days' notice.

"And the said parties of the second part agree to furnish a good and sufficient bond acceptable to party of the first part, equivalent to the moneys actually required and to be put in said building in the erection thereof by the parties of the second part.

"And the said first party further agrees to pay the taxes and all assessments for the year 1909.

"And it is mutually agreed between the parties hereto that the building on the said premises to be erected shall be of the construction known as reinforced concrete and acceptable to party of the first part.

"And the parties of the second part agree to pay all taxes, insurance premiums and charges of every nature which may accrue after January 1, 1910, it being agreed and understood by and between the parties hereto that the rentals provided shall be net to said party of the first part without discount or deduction, excepting, however, the $5,000 which shall be rebated the first year during the erection of the building.

"Said party of the first part agrees that in addition to the property described in the agreement of October 16th, he agrees to lease to the parties of the second part whatever rights he may have in the alley north of the said premises belonging to and attaching to the said premises south of the alley.

"Said parties of the second part agree, on January 1, 1910, to accept the leases now on and affecting the said premises."

In pursuance of these agreements the defendant *S. A. Tolman* tendered a form of lease to the plaintiffs under date of October 28, 1909. The lease tendered was not satisfactory, and on November 5th the plaintiffs prepared and tendered to *Tolman* a lease which they claimed conformed to the agree-

ment of the parties. This lease was accompanied by a form of bond. This form of lease was not satisfactory to *Tolman* and he refused to execute it. Thereafter considerable negotiations were carried on, personally and by correspondence, in an endeavor to agree upon the terms of the lease. On or about February 28, 1910, *Tolman* prepared and submitted a second lease which modified to some extent the terms of the one first presented, and offered to execute the same. This lease was not satisfactory to the plaintiffs and they in turn prepared and on April 16, 1910, presented to *Tolman* a second lease, modifying to some extent the terms contained in the lease which they first presented, and demanded of *Tolman* that he execute the same. This he refused to do, and the negotiations between the parties practically ceased at this time. The premises covered by these agreements were occupied by seven different tenants when the agreements were made. The leases held by six of them expired on May 1, 1910, and after the negotiations had practically come to an end and on April 15, 1910, *Tolman* proceeded to renew the leases of his tenants. Part of the property covered by the proposed leases consisted of the Davidson Theater and the Hotel Davidson. It was necessary to make repairs on these buildings, and the sum of $26,840 was expended in making such repairs. Some attempt was made by the plaintiffs to renew negotiations during the summer of 1911, but nothing came of it. On October 10, 1911, the defendant *Tolman* leased the same premises to his codefendant *Stone* for a period of ninety-nine years.

In addition to the facts recited, the circuit court found (1) that the expression, "on the usual terms as applied to a ninety-nine year lease," which appeared in the contract of October 16th, was used and intended by the parties to mean those terms which were usually applied to a lease for ninety-nine years in the city of Chicago at that time; (2) that *Tolman* directed his attorneys to draw a lease which, in addition

to the matters expressly provided for in the two preliminary agreements, should contain the usual terms applied to a lease for ninety-nine years in the city of Chicago; (3) that in the lease so prepared, bearing date October 29th, there are the usual terms as applied to a ninety-nine year lease in said city, but that certain provisions which related to matters expressly agreed upon in the preliminary agreements were not in accordance with the terms of these agreements; (4) that prior to November 5, 1909, plaintiffs did not propose any sufficient sureties or acceptable bond to said *S. A. Tolman* under said preliminary agreements, and that no contract or arrangement had been made with any sureties by the plaintiffs for the signature of the bond form tendered by the plaintiffs on November 5, 1909; (5) that during the months of August and September, 1911, the defendant *Stone* negotiated with the agent of the defendant *Tolman* for a lease of the property; that on or about September 7th the form of the lease was agreed upon and on October 11, 1911, the same was reduced to writing, executed, and delivered; (6) that at the time the defendants began their negotiations and thereafter they believed that whatever rights the plaintiffs had under the preliminary agreements had terminated; (7) that the failure of *Tolman* to execute and deliver to the plaintiffs a lease of the premises in question was not caused by or due to any act of the defendant *Stone;* (8) that the said lease which was entered into between the defendants was made and entered into in good faith and without intent or design to injure, cheat, or defraud the plaintiffs; that there was no conspiracy or agreement between the defendants to cheat or defraud the plaintiffs or any or either of them; (9) that the defendant *Stone* took possession of the premises under said lease as of October 1, 1911, and has since that time been in possession thereof; (10) that plaintiffs at all times since the preliminary agreements were made have been ready, able, and willing to perform the said agreements and to execute a lease of

the premises conformable with and correctly expressing the terms of said agreements, and that the defendant *Tolman* at all times since the making of said preliminary agreements has refused to enter into a lease conformable with and correctly expressing the terms of said written agreements.

The court also found that there were some provisions in the leases tendered by the plaintiffs on November 5, 1909, and on April 16, 1910, which were not in accordance with some of the terms of the preliminary agreements. The court also found that the same was true of the forms of lease tendered by *Tolman*.

As conclusions of law the court found (1) that it was the duty of the defendant *Tolman* to prepare and tender to the plaintiffs for execution a lease in accordance with the terms of the preliminary contracts, and that he failed to prepare and tender to the plaintiffs such a form of lease; (2) that plaintiff *Goldstine* was entitled to specific performance of the preliminary agreements; (3) that the lease made to *Stone* on October 10, 1911, should be canceled and adjudged to be of no effect.

The only testimony in the case relied on by respondents and bearing on what were the "usual terms of a ninety-nine year lease" was the following: *Mr. Tolman* testified that he presented the matter to his attorney, Mr. Ashcraft, for him to draw a lease in conformity to the preliminary agreement and that he believed his attorney drew such a lease and sent it to Milwaukee. He also said that he requested his attorney to prepare a lease under the usual terms that a ninety-nine year lease is drawn in Chicago and that he believed such a lease was drawn and sent to Milwaukee. The defendants' evidence showed that in 1909 and 1910 there were a great variety of forms of ninety-nine year leases in Milwaukee and that the material portions of such leases were very varied.

The trial court prepared a form of lease which he conceived correctly set forth the agreement upon which the

minds of the parties met. In preparing such lease he included, or at least endeavored to include, all of the terms and conditions contained in the lease as drawn by *Mr. Tolman's* attorneys, excepting only where he found such terms and conditions to be in conflict with the provisions of the preliminary agreements.

For the appellants *Tolman* there was a brief by *Quarles, Spence & Quarles,* attorneys, and *J. V. Quarles,* of counsel, and a separate brief by *E. M. Ashcraft,* of counsel; and the cause was argued orally by *Mr. J. V. Quarles* and *Mr. Ashcraft.*

For the respondents there was a brief by *Harper & McMynn* and *Gilbert J. Davelaar,* and oral argument by *Mr. R. N. McMynn* and *Mr. Davelaar.*

BARNES, J. The plaintiffs in their complaint set forth the preliminary agreements and alleged that on the 5th of November, 1909, they tendered the defendant *Tolman* a lease in full performance of and in compliance with such agreements and demanded execution thereof, and that thereafter considerable correspondence and negotiations took place between the parties, and that again on April 16, 1910, they tendered a second lease in full performance of and in compliance with the terms of said agreements and demanded execution thereof, and that defendant *Tolman* refused and still refuses to execute and deliver the lease which he agreed to enter into, and that plaintiffs fully performed the terms and conditions of the preliminary agreements and were willing to accept a lease of the premises conformable with and correctly expressing the agreement of the parties. The relief demanded was that the contract be specifically enforced and that plaintiffs recover the damages sustained by reason of the delay, which were placed at $351,666.70.

It was stipulated that the action should proceed to trial, reserving proof as to the amount and assessment of damages,

for a compulsory reference, or trial by the court, if such should prove to be necessary, and that on the trial had the case should proceed to judgment, which judgment should determine all of the issues except the amount and assessment of damages reserved as stated.

The trial court held that the forms of lease submitted by the defendant *Tolman* to the plaintiffs on October 28, 1909, and on February 28, 1910, did not conform to the requirements of the contract for a lease. The court also held that the same was true of the forms of lease which the plaintiffs submitted to *Tolman* under dates of November 5, 1909, and April 16, 1910. The court further held in a decision rendered on the question of costs that the forms submitted by *Tolman* conformed more closely to the lease to which the plaintiffs were entitled than did the forms proposed by the plaintiffs.

The trial court apparently proceeded on the theory that the preliminary agreements constituted a definite contract upon the terms of which the minds of the parties met, and that the first lease submitted by *Tolman* correctly embodied the agreement of the parties, except as to matters wherein it was in conflict with the specific provisions of the two preliminary agreements. The lease prepared by the court was framed on this basis. Evidently the court was also of the opinion that the duty rested upon the defendant *Tolman* to prepare such a lease as it was found that the parties agreed upon, and that, having defaulted in this duty, it was proper for the court to ascertain what the contract in fact was and give relief by way of specific performance.

We are unable to reach the same conclusion as did the trial court as to the effect that should be given to the two preliminary agreements. We do not think they evidenced a contract upon the terms of which the minds of the parties met as to all essential details and covenants, and we think it is very evident that the parties did not so regard those tentative

agreements. It is obvious that these contracts were entered into in good faith by both parties and with the expectation that a satisfactory lease could be agreed upon. Some of the main provisions were definitely provided for, such as the duration of the lease, the rental to be paid, the amount to be invested in a new building, the time when it was to be completed, the ownership of it at the end of the term, and the amount of money which *Tolman* was to advance to aid in its construction, as well as some other matters. But there were a great many provisions which were not covered by the tentative agreements, except by the very general and what would seem to be indefinite recital that the lease was to be made "on the usual terms as applied to a ninety-nine year lease." These preliminary agreements take up about three pages of the printed case. The lease prepared by the court covers twenty-five pages and contains about twenty covenants that are not mentioned in the writings signed by the parties, except as they are covered by the clause referring to the usual terms contained in ninety-nine year leases. All matters mentioned in the tentative agreements were not definitely settled and provided for therein.

We regard these contracts as amounting to an agreement of the parties on such of the points as were specifically covered and an agreement to agree, if possible, on those which were not. They made a starting point for negotiations and treaty on those matters which were not agreed upon, instead of definitely settling the rights of the parties on all material questions. This conclusion can be quite satisfactorily reached from the provisions of the preliminary agreements. It is also apparent from the construction which the parties themselves placed upon these contracts. Not only was there a disagreement upon the matters which were left indefinite, but both parties endeavored to secure modifications of certain provisions of the agreements which were definite. Such conduct was consistent only with the belief that a lease had not

been agreed upon and that either party was at liberty to make the best trade he could during the negotiations.

It is clear that the two agreements referred to were not intended to constitute the lease which the parties were to make, because they provided for another one which would specifically cover the mutual obligations to be assumed by the parties. While the same subjects may be quite generally covered by ninety-nine year leases, it would be remarkable if there was a general uniformity in the manner in which they were covered or in the obligations assumed in reference thereto. The proof showed that there was no general uniformity as to such leases in Milwaukee. We are not unmindful of the fact that respondents insist that the matter is fully covered in *Tolman's* evidence. We do not think so, but this point in itself is not of sufficient importance to discuss it at length.

The parties had in contemplation that in an important and complicated transaction of this kind attorneys would be employed to draft the necessary papers, and they were employed by both parties. *Tolman* did not desire to be out any money on this account if the negotiations resulted in nothing, and so required the plaintiffs to pay him $250 to make him whole if the negotiations fell through. If they did not, the amount was to be credited on rent. This provision very clearly indicated that the parties did not understand that the terms of the lease had been agreed upon. It is argued that the money was paid as compensation for drawing a lease, the terms of which had been settled, but the language of the agreement itself and the subsequent conduct of the parties clearly show that such was not the case. If it was, why was the provision made for crediting the amount on rent if an agreement to lease was consummated? Aside from the reference to the usual terms on which ninety-nine year leases are drawn, the preliminary contracts are indefinite in some respects and approach being unenforceable in others. The first one provides

that plaintiffs shall give sufficient security that they will put up a building to cost not less than $200,000. Nothing is said as to who shall pass upon the sufficiency of the security or as to how it shall be determined. The plans and specifications of the new building were required to be submitted to *Tolman*, and no building could be put up without his approval. If this provision were enforced according to its terms, *Tolman* could prevent the erection of any building. This was one of the clauses on which the parties split during their earlier negotiations. *Tolman* construed the provision last referred to as giving him the absolute right to say what kind of a building should be put up, and in the first lease which he had prepared he specified that it should be a hotel building. Plaintiffs declined to accept this construction as being correct. This agreement required plans and specifications for the building to be submitted to *Tolman* for his approval, in addition to providing that no building should be built without *Tolman's* approval. The first lease prepared by *Tolman* contained such a provision. That submitted by plaintiffs on November 5th provided that the plans and specifications should be submitted, not to *Tolman*, but to such a firm of engineers of the city of Chicago and of established reputation as *Tolman* might select. This was a very proper modification of the agreement of October 16th to contend for if the parties were simply negotiating. The plaintiffs had no right to insist on it if there was nothing left to negotiate.

There was a ten-foot alley running east and west which formed the north boundary line of the leased property. *Tolman* owned property to the north of the alley which was not included in the lease. By the second supplemental agreement *Tolman* agreed to lease such rights as he had in the alley "belonging to and attaching to the said premises south of the alley." *Tolman* construed this provision as requiring him to lease all his rights in the south half of the alley and so provided in the lease of October 28th. The plaintiffs, in

their lease of November 5th, included "all the rights of the lessor in and to the ten-foot alley." This would shut out the occupant of *Tolman's* property to the north of the alley from the use of it. Some of these matters were adjusted later, but others were left which the parties were unable to adjust.

It would serve no useful purpose to engage in a tedious recital of the various matters of difference between the parties. At one time or another, in addition to the disputes mentioned, they disagreed as to who should assume responsibility for obtaining consent to the assignment of Gimbel Brothers' lease; as to whether *Tolman* should turn over to plaintiffs $5,000 advanced as security for the Sherman Brown lease; as to the payment of certain taxes; as to the ownership of the building when it was completed; as to the amount of the bond to be given; as to whether the interest on *Tolman's* loan should be paid in advance or not; as to conditions under which plaintiffs might assign their lease; as to the liability of the original lessees in case of an assignment; and as to the right of the lessor to increase a mortgage on the property covered by the proposed leases. If the minds of the parties met on a contract, none of them knew it or knew what the contract was. It is argued with much force and reiteration that plaintiffs were willing and ready at all times to accept such a lease as the court finally found was agreed upon. Either the argument is without foundation or else the plaintiffs were acting in bad faith. They asserted the contrary in the two leases which they prepared and submitted, in their communications with *Tolman* while the negotiations were pending, and finally in their pleadings in this action. It is true, they say in the complaint that they have at all times been ready to accept such a lease as the parties agreed upon, but they also say that each of the leases submitted by them conformed to the agreement. This could not be correct in any event, because there were some material differences between the two leases submitted. These differences

did not consist of particularization in the second lease as to matters which were generally covered by the first one.

The facts are: The lease submitted by *Tolman* on October 28th was unsatisfactory to the plaintiffs. On November 5th they presented a lease drawn by their attorney, which they claimed and probably thought embodied the agreement of the parties. *Tolman* refused to execute this lease because it was not in accordance with his understanding of the agreement. Interviews took place and communications passed between the parties and an endeavor was made to reach an agreement. Some concessions were made, and as a final offer *Tolman* on February 28th submitted a second draft of a lease which was not satisfactory to plaintiffs. Negotiations continued, and on April 16th plaintiffs submitted their ultimatum in the shape of a draft of a new lease, which *Tolman* declined to accept. This practically brought negotiations to an end. By active or tacit consent the parties agreed that they could not agree. It is difficult to see how it can be said that the minds of the parties met on a contract, when neither of them, after six months of effort, was able to say what it was. We have the statement of the court that *Tolman* came nearer hitting the mark than did the plaintiffs, and we are inclined to think the statement is correct, although not very material. The essential point is that neither of the parties knew that they had made such a contract as the court found until the court said so. The plaintiffs then discovered not only that they were prepared to accept the lease drawn by the court, but that they had been willing to do so all the time. A letter written by plaintiffs' attorney to *Tolman* on the day on which the lease of April 16th was transmitted contained this statement:

"I desire to state that my clients stand upon the original agreement and ask no change and have not changed their purpose or intention since the same was executed, of fully complying with the same and signing the lease therein provided,

and it is you and not them that have held this matter in abeyance.

"Find inclosed leases in duplicate, including a bond which my clients are ready and willing to execute and have been since they signed the original agreement with you. . . ."

Here we have a pretty positive assertion that the leases submitted by plaintiffs contained their understanding of what the contract was. If this is so, then the court's lease did not. If the minds of the parties met on a contract, surely one or the other of them should, after six months of endeavor, be able to tell what it was.

We think the conclusion reached is well supported by the authorities, as will be seen from a reference to the following cases: *Sourwine v. Truscott,* 17 Hun, 432; *McIntosh v. Miner,* 37 App. Div. 483, 55 N. Y. Supp. 1074; *Federal L. & S. Co. v. Hatch,* 147 Iowa, 18, 125 N. W. 837; *Methudy v. Ross,* 81 Mo. 481; *Water Comm'rs v. Brown,* 32 N. J. Law, 504; *St. Louis & S. F. R. Co. v. Gorman,* 79 Kan. 643, 100 Pac. 647; *Bryant v. Ondrak,* 87 Hun, 477, 34 N. Y. Supp. 384; *Laroussini v. Werlein,* 52 La. Ann. 424, 27 South. 89; *Mayer v. McCreery,* 119 N. Y. 434, 23 N. E. 1045; *Buck v. Pond,* 126 Wis. 382, 105 N. W. 909; *Auer v. Mathews,* 129 Wis. 143, 108 N. W. 45; *Poole v. Tannis,* 137 Wis. 363, 118 N. W. 188, 864; *Thoemke v. Fiedler,* 91 Wis. 386, 391, 64 N. W. 1030; *Mississippi River L. Co. v. Wheelihan,* 94 Wis. 96, 68 N. W. 878; 1 Tiffany, Landl. & T. § 64; *Charlton v. Columbia R. E. Co.* 64 N. J. Eq. 631, 54 Atl. 444; *Arnold v. R. Rothschild's Sons Co.* 37 App. Div. 564, 56 N. Y. Supp. 161; *Foster v. Clifford,* 42 Misc. 496, 86 N. Y. Supp. 28; *Donnison v. People's C. Co.* 45 Law T. N. S. 187.

While it is true that, where a contract informal but complete in its terms appears to have been made, it will take effect although the parties contemplate that a more formal contract will thereafter be made, it is also true that writings

passing between the parties will not be construed as a contract where it is plain that they were intended only as preliminary negotiations, to be followed by a formal contract containing material provisions not contained in or to be inferred from the preliminary writings. *Francis H. Leggett & Co. v. West Salem C. Co.* 155 Wis. 462, 144 N. W. 969, and cases cited.

If we should accept the conclusion that the minds of the parties met on the terms of the lease prepared by the court, we think no recovery should be allowed, because both of the parties breached their contract if they made one, and it was as much the fault of the plaintiffs that the proper lease was not executed as it was that of *Tolman.* The plaintiffs were no more willing than was *Tolman* to enter into the lease drawn by the court, until they found that they had to accept such lease or nothing. There never was any partial performance, unless it can be said that the amount exacted by *Tolman* to indemnify him against expenses for attorney's fees in case no lease was agreed upon constituted such performance. We do not see how this could be, when the money was paid, not on the theory that a contract had been made, but to provide for the contingency that no contract would be made. After many futile attempts on the part of both parties to secure a lease differing from that prepared by the court, negotiations were abandoned. The plaintiffs in effect said they would not accept such a lease as the court found was made, and the defendant *Tolman* said he would not give such a lease. More than a year and a half thereafter, and after *Tolman* had spent $27,000 in repairs and made a ninety-nine year lease to another party, the plaintiffs, conceiving that they were right in their contention as to what the lease should contain, brought this action to compel *Tolman* to execute such a lease as they submitted to him on November 5, 1909, or else such a one as they submitted April 16, 1910. The court held, and was justified in holding, that plaintiffs were not entitled to either of the leases which they sought, but pro-

·ceeded to supply a new one, which up to this time was not ·satisfactory to any one. We think under the circumstances ·of this case it was just as incumbent on the plaintiffs to correctly state the terms of the lease as it was upon *Tolman,* and, having breached a duty to the same extent that he did, there can be no recovery.

As a conclusion of law the court found that the duty devolved on *Tolman* to prepare such a lease as the court found was made. The whole burden was placed on him and no significance was given to the conduct of the plaintiffs. We think this conclusion is not warranted by the facts. No doubt it was understood and contemplated by the parties that *Tolman* should present to the plaintiffs a draft of a lease ·drawn according to his views. For reasons already stated, we do not think it was within the contemplation of either party that this draft would meet the views of both parties. It was the duty of the plaintiffs upon receipt of it to object to the things which they considered objectionable therein. If this were not so, they assumed to perform such a duty. They presented not one lease but two which they insisted contained the true conditions of the agreements, and the ones and the ·only ones which they were willing to accept. Having assumed the duty of stating what the contract was, why were they absolved from the duty of stating it with substantial accuracy any more than was *Tolman,* and why was not their failure to do so as much a breach of their obligation as was *Tolman's* like failure a breach of his obligation? The con·clusion reached on the other branch of the case renders it unnecessary to further elaborate on this one or to treat the question of laches or other questions that were argued at length ·on the appeal.

*By the Court.*—The judgment appealed from is reversed, and the cause is remanded with directions to dismiss the ·complaint.