Elaine SKRUPKY, Plaintiff-Appellant,

v.

Stephen T. ELBERT and Lynn Marsh-Elbert,
Defendant-Respondents,

A. C. WIDDES, d/b/a A. C. W. Trucking, Defendant.

Court of Appeals

*No. 93–3414. Submitted on briefs October 3, 1994.—Decided
November 1, 1994.*

(Also reported in 526 N.W.2d 264.)

35

On behalf of plaintiff-appellant, the cause was submitted on the brief of *Gregory A. Jennings* of *Gregory A. Jennings Law Offices* of Chetek.

On behalf of defendant-respondent, the cause was submitted on the brief of *John W. Welter* of *Schrage, Marjala, Kaiser & Welter* of Eau Claire.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. Elaine Skrupky, the seller in a land contract foreclosure action, appeals a money judgment awarded on the counterclaims of Stephen Elbert and Lynn Marsh-Elbert (the buyers). Following a bench trial, the circuit court awarded the buyers tort damages of $81,849.30, including $17,830 in attorney fees, less $58,127.21 awarded Mrs. Skrupky as the principal balance due under the land contract. Although a number of issues are raised, the following are dispositive: (1) whether the evidence supports the finding that Mrs. Skrupky's son, Lynn Skrupky, was acting as her agent when he misrepresented the condition of the property; (2) whether the evidence supports the damage award; (3) whether the award of attorney fees under the deceptive advertising statute, § 100.18, STATS., was beyond the three-year statute of limitations; and (4) whether the trial court erroneously exercised its discretion by refusing to award interest on the unpaid principal balance of the land contract.

We conclude: (1) The evidence supports a factual inference that Lynn had implied actual authority under the laws of agency, the trial court's finding of

38

agency was not clearly erroneous and his misrepresentations impose liability upon Mrs. Skrupky as a principal; (2) the evidence is sufficient to sustain only specified parts of the damage award; (3) the deceptive advertising claim was not filed within the statute of limitations; and (4) the trial court did not erroneously exercise its discretion under its equitable powers to deny interest on the unpaid land contract principal. We therefore affirm the imposition of liability for misrepresentation, but reverse and remand for recalculation of the damages consistent with this decision.

## BACKGROUND

Mrs. Skrupky inherited the subject parcel of commercial real estate in the City of Rice Lake from her late husband, Hartford Skrupky, who had operated a used car sales business on the site until his death in 1982. At an earlier time, others had used the site as a gasoline station, and the property housed three underground gasoline storage tanks and a waste oil tank.[1] Upon Hartford's death, the Skrupkys' son, Lynn, took over operation of the business for his mother. He managed all aspects of it, turning the profits over to his mother after paying his salary and the operating expenses.

---

[1] The property also formerly housed an underground fuel oil tank that was apparently removed sometime prior to sale. Although Mrs. Skrupky in her statement of facts suggests the absence of a causal connection between the underground gas tanks and pipes and the discharge found on the property, she does not raise an issue or argue the matter further. An issue raised but not briefed is deemed abandoned. *Reiman Assocs. v. R/A Advertising*, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292, 294 n.1 (Ct. App. 1981).

For a number of years, the city had sought compliance with a municipal ordinance relating to abandonment of underground gas tanks. After Hartford's death in 1982, a city fire department inspector served Lynn with orders, one addressed to "Skrupky Auto Row" and another directed to the "Hartford Skrupky Estate," to either remove or empty and fill the underground gas tanks as required by law.[2] Lynn provided his mother with the written directive detailing the specific requirements of the law. They also discussed "the ramifications and the legalities of what we are forced to do."[3] Mrs. Skrupky casually noticed but did not participate in the filling operation. Lynn poured a sand and water mixture into only one of the three fill pipes until he decided it would take no more. He then reported to the inspector that he had complied with the order. The inspector accepted Lynn's verbal assurance "at faith" and deemed the requirements satisfied. The

---

[2] The order was made pursuant to a municipal ordinance that adopted standards set forth in the Wisconsin Administrative Code by the Department of Industry Labor and Human Relations.

[3] The order stated that an inspection revealed violations of the municipal code, also referred to WIS. ADM. CODE § Ind. 8.225 and required "proper abandonment in an approved manner of the underground flammable liquid storage tanks located on this property." It also stated:

The tanks may be abandoned in place by following these steps:

1. Remove all flammable or combustible liquid from the tank and from all connecting lines;

2. Disconnect the suction, inlet gauge and vent lines;

3. Fill the tank completely with an inert solid material; and

4. Cap remaining underground piping.

The alternative to steps one through four above is to remove the tanks completely from the ground and the property.

order was stamped completed and dated July 25, 1983. Lynn then showed this document to his mother.

In 1985, Mrs. Skrupky placed the property for sale with a listing broker, and the broker's "For Sale" sign appeared on the property. The buyers were long-time former neighbors of the Skrupkys. One of the buyers, himself an environmental compliance specialist, stopped at the property and spoke to Lynn, who was on the premises. At the time, the concrete islands upon which the gas pumps formerly stood, as well as several brass covers over several fill pipes, were plainly visible. The buyer explained to Lynn the plans for his wife and him to operate a feed and seed business on the property, and inquired whether the underground tanks had been filled. Lynn told him that the tanks had been filled with sand. Lynn reported to his mother that the buyers had approached him about purchasing the property, and told her of their intent to operate a seed business on "our property."[4]

Mrs. Skrupky later accepted a written offer to purchase from the buyers, the relevant terms of which are set forth later. Mrs. Skrupky and the buyers then entered into a land contract. Several years later, when the buyers discovered ground contamination, the tanks were dug up and removed. The tanks were neither drained nor filled, with the exception of one tank about one-third filled, and the vents and pipes were not properly disconnected or capped. The city inspector who had approved the abandonment later acknowledged that a subsequent inspection and other trial evidence demonstrated that Lynn had not met the requirements of the law.

---

[4] Lynn testified: "I said, Mom they're buying our property to sell bird seed. We got a little chuckle off that."

The buyers stopped making contract payments, and Mrs. Skrupky brought this action for foreclosure. The buyers counterclaimed under a number of theories for damages for cleanup costs and business losses. The trial court granted the counterclaim on each of the theories pleaded and awarded damages after a setoff for outstanding principal due. It denied Mrs. Skrupky's demand for interest on the unpaid sum.

## DISCUSSION

### A. MISREPRESENTATION IN THE OFFER TO PURCHASE CONTRACT

██

We concur with Mrs. Skrupky's contention that there was no misrepresentation by virtue of the language in the initial offer to purchase agreement, which reads:

> Seller warrants and represents to Buyer that Seller has no notice or knowledge of any:
>
> . . ..
>
> (b) government agency or court order requiring repair, alteration or correction of any existing condition.
>
> . . . .

` EXCEPTIONS TO WARRANTIES AND REPRE-SENTATIONS [ABOVE]:

> Understandably, seller cannot warrant continued operation of mechanical systems nor guarantee condition of premises. Buyers have inspected the property and accept "as is".

While the parties debate the scope and validity of the "as is" language in the exception clause, the dispos-

itive factor is the indisputable evidence that the representation made in paragraph (b) was true.

There simply was no "government agency or court order requiring repair, alteration or correction of any existing condition" at the time this representation was made. To the contrary, the city had declared in writing in 1983 that its order was "completed." Thus, Mrs. Skrupky had no notice or knowledge of any agency or order requiring correction of an existing condition.

## B. MISREPRESENTATION BY A PRINCIPAL'S AGENT

We turn to the question of whether the trial court erred by attributing to Mrs. Skrupky her son's untrue statement to the buyers. We conclude that this misrepresentation that the tanks were filled was authorized by Mrs. Skrupky under principles of the law of agency. "Agency is a consensual, fiduciary relation between two persons, created by law by which one, the principal, has a right to control the conduct of the agent, and the agent has a power to affect the legal relations of the principal." WARREN A. SEAVEY, HANDBOOK OF THE LAW OF AGENCY § 3 at 3 (1964).

Authority can be created in any way in which a person can manifest consent to another; because the words, acts and conduct of the principal are the basis of the authority, manifestation of consent may be proved, as other acts are proved, by any relevant evidence. *Id.* § 18, at 32. Manifestation of consent may also be proved by acquiescence. RESTATEMENT (SECOND) OF AGENCY § 7 cmt. c (1958).

Actual authority may be express or implied. *Select Creations v. Paliafito America*, 830 F. Supp. 1223, 1233

43

(E.D. Wis. 1993).[5] Actual authority is express when found within the explicit agency agreement itself, that is, the communication or contract between the principal and the agent. *Id.* Actual authority is implied when the agent, not the third party, reasonably believes he or she has authority as a result of the action of the principal. *Id.* An agent has the implied authority to do such acts as are usual, appropriate, necessary or proper to accomplish the purpose and objects of the agency. *See* WIS J I—CIVIL 4010.

■ The evidence is sufficient to permit the trier of fact to reasonably infer that the words and conduct of Mrs. Skrupky and her son created an implied actual authority for him to represent the condition of the property to the buyers. For years Lynn had Mrs. Skrupky's authority and consent to conduct all of the business affairs relating to the property. She authorized him to conduct the steps necessary to comply with the abandonment directive addressed to her husband's estate from which she inherited the property. Significantly, there is no dispute that she acquiesced in Lynn's discussion with the buyers about a purchase after she publicly placed it for sale. The finding of implied actual authority was not clearly erroneous.

---

[5] *Accord* RESTATEMENT (SECOND) OF AGENCY § 7 cmt. c (1958).

It is possible for a principal to specify minutely what the agent is to do. To the extent that he does this, the agent may be said to have express authority. But most authority is created by implication. . . . These powers are all implied or inferred from the words used, from customs and from the relations of the parties. They are described as "implied authority." Although frequently used, the phrase "express authority" is usually not adequate to describe the agent's authority, and the use of the adjective "implied" is unnecessary. Both adjectives are to be distinguished sharply from "apparent" [authority].

We must decide next whether this authority is sufficient to hold the principal liable for the agent's misrepresentations under these circumstances.

> A principal is liable in an action at law for misrepresentations by an agent in the course of transactions authorized or apparently authorized if
>
> . . ..
>
> (b) the statement is as to a matter upon which the principal would expect representations to be made and the agent's statement is one which it is not too unlikely that a fraudulent agent might make, or
>
> (c) the agent's position enabled him to deceive.

SEAVEY *supra*, § 92, at 162.

The preceding summary of the law applies to determine the consequences of Lynn's misrepresentation. Lynn's position as his mother's agent in the affairs of management of the property enabled him to deceive. His statement also was on a matter on which a principal would expect representations to be made. The signs of a former gas station were plainly observable to Mrs. Skrupky and any potential buyer. Her discussion with her son of the "legal ramifications" of underground gas tanks renders Lynn's later misrepresentation one that it is not unlikely that a fraudulent agent might make. The law holds the principal liable for her agent's misrepresentation under these conditions.[6]

---

[6] In a case authored by Circuit Judge Stephen G. Breyer (now Justice Breyer of the United States Supreme Court), the first circuit, citing WARREN A. SEAVEY, HANDBOOK ON THE LAW OF AGENCY, noted that the common-law typically holds principals liable for misrepresentation whether the authority is express or implied. *In re Atlantic Finan. Mgmt.*, 784 F.2d 29, 31 (1st Cir. 1986).

Although the trial court held that Mrs. Skrupky was liable for each of three recognized forms of misrepresentation, intentional, negligent and strict responsibility, we need only briefly examine the latter to sustain the judgment.

Wisconsin case law has developed the doctrine of strict responsibility primarily in cases involving the sale of property. *See* WIS J I—CIVIL 2400 Law Note for Trial Judges. The elements require clear and satisfactory evidence of (1) a representation of fact; (2) that is untrue; (3) based either on personal knowledge or under circumstances where the speaker necessarily ought to have known the truth or untruth of the statement; (4) claimant's economic interest in the transaction; and (5) claimant's belief in the representation. *See* WIS J I—CIVIL 2402. These elements were proven in this case. In fact, Mrs. Skrupky raises no issue regarding proof, apart from challenging her liability for Lynn's statement.

## OTHER BASES OF LIABILITY

We need not address the question whether the statement by the subagent of the listing broker creates similar liability.[7] Nor do we reach the issue of whether

---

[7] Professor Seavey suggests there is no liability for a listing broker's misrepresentations absent actual authority to speak about conditions of the property, and cites cases from other jurisdictions.

> The functions of agents authorized to contract to sell should be distinguished from those of the real estate broker who merely lists property for sale. His function normally is not to speak for the principal except to let others know that he has property to sell or to

§ 144.76, STATS., creates a private cause of action.[8] If a decision on another point disposes of the appeal, the appellate court will not decide other issues raised. *Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559, 562 (Ct. App. 1983).

## PROOF OF DAMAGES

Mrs. Skrupky next challenges the sufficiency of the evidence to support the damage award. Wisconsin has adopted the benefit of the bargain measure of damages in actions based upon strict responsibility. *Neas v. Siemens*, 10 Wis. 2d 47, 102 N.W.2d 259 (1960). This rule gives the equivalent of what the injured party would have received if the representation relied upon had been true. *See* WIS J I—CIVIL 2400 (citing SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1392

---

exchange and hence the courts tend to limit the principal's liability for his statements to a minimum. Thus the principal was not bound by the broker's statement as to the past income from the property, as to its title, or other facts, not specifically authorized, including in some cases even the location of the property.

WARREN A. SEAVEY, HANDBOOK ON THE LAW OF AGENCY § 92, at 164 (1964) (footnotes omitted).

Neither party cites any relevant Wisconsin case law, but recent legislation may bear upon this issue in the future. *See* Wrede H. Smith Jr. & Richard J. Staff, *The New Real Estate Agency Law: Redefining the Role of Real Estate Brokers*, WISCONSIN LAWYER, Oct. 1994, at 8, discussing 1993 Wis. Act 127, based on 1993 Assembly Bill 816 enacted March 3, 1994.

[8] Mrs. Skrupky cites case law to suggest that it does not. *Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 661, 476 N.W.2d 593, 602 (Ct. App. 1991), holds that there is no private cause of action for violations of §§ 144.43 and 144.44, STATS. These statutes appear in the same subchapter as § 144.76, entitled Solid Waste, Hazardous Waste and Refuse.

(rev. ed. 1957), and CHARLES T. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 121, at 453-54 (1935)). These damages may be measured in two ways: (1) the difference between the value of the property as represented and its actual value as purchased, or (2) the reasonable cost of placing the property received in the condition in which it was represented to be. *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 52-53, 288 N.W.2d 95, 112 (1980). Consequential damages, such as loss of profits, travel expenses and the like may be awarded also if such damages do not duplicate the recovery gained under the benefit of the bargain damages. *Id.* at 53, 288 N.W.2d at 112; *see also* DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 9.2 at 598 (1973).

We agree with Mrs. Skrupky's contention that much of the damage claim for past losses sustained as the result of the misrepresentation were unproven. The buyers casually depreciate the challenge to the damage award in reliance upon an alleged stipulation to the receipt of their answers to interrogatories. This reliance is misplaced. First, we have searched the record in vain to find a stipulation.[9]

More important, however, is the buyers' implied conclusion that a stipulation to the receipt of evidence is equivalent to a stipulation to the sufficiency of that evidence. Thus, while we have located the clerk's min-

---

[9] The buyers do not cite to the record in this regard. RULE 809.19, STATS., provides in part:

(1) ... The appellant shall file a brief.... The brief must contain:
. . . .

(d) ... a statement of facts relevant to the issues presented for review, with appropriate references to the record.
. . . .

(3) Respondent's Brief. ... The brief must conform with sub. (1)
. . . .

48

utes of the trial to show that the answers to interrogatories were offered and received in evidence, those answers are decidedly inadequate to prove many of the alleged damages.

## A. PAST LOSSES

We first examine those items of damages that we conclude were not sufficiently proven from the evidence, beginning with past losses, or what the answers characterized as "liquidated damages." The buyers included "Business Losses and Expenses" totaling $23,371. The major part of this claim was for $18,000 in lost profits. The answer to interrogatories merely asserts: "Christmas Trees: lost profits [19]89 (full) [$]8,000.00 [19]90 (partial) [$]4,000.00 Sunflower seeds and misc. seed profits [$]6,000.00 . . . ."

The buyers presented no testimony to expand upon the preceding assertion. While one witness briefly explained the circumstances that caused the losses, there was no attempt to prove the amounts claimed as losses.[10] Except for a brief cross-examination, the record is silent. The cross-examination shows only the following exchange:

Q. What were your Christmas Tree profits in 1988?

A. I don't have that with me.
. . . .

---

[10] The witness explained that trees could not be purchased in 1989 because of the uncertainty whether the business could be operated. In 1990, due to the expense of cleanup, there were insufficient funds to finance purchases of inventory, and the excavation on the premises eliminated the area necessary to display or store the goods.

Q. How do you come up with the $8,000 lost profits in 1989?

A. Well the accounting office that I used went through the records and we documented everything all of the way along, and we had tracked within the charting every month where we were last year to date, and what our projections were.

. . ..

Q. And in 1990 you have partial loss in your losses and expenses of $4,000?

A. Yes.

. . ..

Q. You have sunflower seeds and miscellaneous seed profits of $6,000?

A. Yes.

There is no evidence in any form of past or present income, past or present expenses, or any proof of past or present profits. There is no stated basis for the formula or calculation of profits, or the nature, source or accuracy of any business records upon which the amounts were reached. We agree with Mrs. Skrupky's contention that *Lindevig v. Dairy Equip. Co.*, 150 Wis. 2d 731, 738, 442 N.W.2d 504, 507 (Ct. App. 1989) (quoting *Maslow Cooperage Corp. v. Weeks Pickle Co.*, 270 Wis. 179, 191, 70 N.W.2d 577, 583 (1955)), states the general rule: "Where damages are susceptible of precise proof, or of estimation by those having knowledge, or are capable of proof with certainty, such proof must be adduced."

In fact, the unsuccessful claimant in *Lindevig* presented more relevant evidence than the buyers did here. In that case, there was evidence of gross sales for the year previous to the injury, and evidence of the

percentage of gross price markup upon which profits were calculated. *Id.* at 738, 442 N.W.2d at 507. The proof failed, however, because there was no evidence of expenses, even though the books were available to show them. *Id.* at 740, 442 N.W.2d at 508. The attempt to compute lost profits without production of expenses was deemed inadequate. *Id.* That court also noted the general rule that:

> Damages for lost profits need not be proven with absolute certainty, but the claimant must produce sufficient evidence . . . in this case, the books and records, on which to base a reasonable inference as to a damage amount. To establish lost profits, the claimant must produce evidence of the business's revenue as well as its expenses.

*Id.* (citation omitted). The claim of $18,000 for lost profits must therefore be rejected for failure to produce evidence to support it.

The buyers similarly produced no evidence of any kind to establish the claim for telephone calls totaling $672.15 and miscellaneous office expenses, mileage, lodging and meals totaling $713.41. These amounts must also be deducted from the damage award.

The remaining claims, however, for past business losses and expenses totaling $5,371 were proven. There was detailed evidence regarding the $1,200 for additional employee expenses; and, while the witness gave conflicting responses for a $621 increase in insurance premiums, the trial court resolves these conflicts and weighs the credibility of witnesses. *See Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647, 650 (1979). The claim of $650 for increased freight charges, $2,000 for off-premises

warehouse rental, $400 for truck hauling expense and $500 for nursery merchandise ruined by seepage were sufficiently established.

The claim for ACW Trucking, Inc., of $9,898.96 is challenged on grounds that no one testified that the work was reasonable and necessary. The evidence included an itemized bill specifying the date and hours of work, the hourly rate and the work performed. In addition, a company employee explained the nature of the work performed. While direct testimony is lacking that the work was reasonable and necessary, under the circumstances the trial court was entitled to infer this from the evidence, especially where there was no attempt to cross-examine the witness about the matter.

Mrs. Skrupky's challenge to the incurred charges of $14,962.76 from Braun Intertec, the environmental consulting firm, is first based upon the buyers' uncertainty as to which portion of the bill remained unpaid. The absence of proof of prior payment is no impediment to the claim itself.

The miscellaneous expenses of $2,301.02 included an itemized list of the claim, together with sufficient testimony to sustain the award.

## B. FUTURE LOSSES

We reject the challenge to the award of $6,100 for additional future charges by Braun. While the project manager acknowledged that he did not know to a reasonable degree of certainty what the future cost for closure of the site was going to be, this admission has to be reviewed in proper context. The witness had reviewed a letter from the DNR detailing the continued work necessary to close the site. His estimate, he said,

was given on the assumption "that no further contamination is found on the site." Thus, his admission of uncertainty could reasonably have related only to whether there would be added future costs, thus increasing his estimate. The trial court resolves which of two reasonable inferences to draw from the evidence. *Ernst v. Greenwald*, 35 Wis. 2d 763, 772, 151 N.W.2d 706, 711 (1967).

Similarly, the witness' testimony includes sufficient support in the form of an estimate from Jeff Smith Masonry for $1,500 for materials and labor to replace concrete removed in the cleanup operation.

In summary, we deduct $18,000 for lost profits, the claim for $672.15 for telephone calls and the claim for miscellaneous office expense for $713.41. The balance of the award of damages, with the exception of $17,830 in attorney fees discussed hereafter, is affirmed.

## AWARD OF ATTORNEY FEES FOR DECEPTIVE ADVERTISING

We emphasize at the outset of this discussion that Mrs. Skrupky raises no challenge, other than timeliness, to the application of § 100.18(1), STATS., to the circumstances of this case.[11] Nor does she raise an issue with the reasonableness of the fees charged. The parties debate only whether the three-year statute of limitations rule is extended by the equitable discovery rule announced in *Hansen v. A.H. Robbins Co.*, 113 Wis. 2d 550, 335 N.W.2d 578 (1983).

---

[11] We also point out that in light of the successful claim for deceit, it would be superfluous to review this claim except that, unlike the other claims, it provides for attorney fees.

53

We agree with Mrs. Skrupky that the statute of limitations considered in *Esser Distrib. Co. v. Steidl*, 145 Wis. 2d 160, 426 N.W.2d 62 (Ct. App. 1988), is analogous to the statute at issue here, § 100.18, STATS. In *Esser*, the court considered the language of the securities fraud statute, § 551.59(5), STATS. (1985-86), which read: "No action shall be maintained unless commenced before the expiration of 3 years after the act or transaction constituting the violation . . . ." *Esser*, 145 Wis. 2d at 164, 426 N.W.2d at 64. The statute of limitations here, § 100.18(11)(b)3, provides: "No action may be commenced under this section more than 3 years after the occurrence of the unlawful act or practice which is the subject of the action." We decline to review issues not raised. *See In re Estate of Balkus*, 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985). Mrs. Skrupky argues that because the misrepresentations forming the basis for the claim of "misleading or deceptive advertising" under § 100.18(1),[12] occurred prior to September 1985, the

---

[12] Section 100.18, STATS., provides in part:

Fraudulent representations. (1) No person, firm, corporation or association, or agent or employe thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employe thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card,

date the land contract was signed, the claim filed in 1991 was beyond the three-year statute of limitations.

*Esser* held that when a statute establishes a definite point of accrual, the *Hansen* discovery rule does not apply. *Esser*, 145 Wis. 2d at 169-70, 426 N.W.2d at 66. *Esser* concluded that the "plain language [of the statute] measures the time from the act or transaction, and, as such, we consider it to be a legislatively created 'non-discovery rule' outside the reach of *Hansen*." *Id.* at 170, 426 N.W.2d at 66. The language of § 100.18(11)(b)3, STATS., is virtually the same as that found in *Esser*.

*Hansen*, on the other hand, examined the meaning of § 893.14, STATS., dealing with the time for commencing an action for personal injuries. *Hansen*, 113 Wis. 2d at 554, 335 N.W.2d at 580. That statute provided: "The following actions must be commenced within the periods respectively hereinafter prescribed *after the cause of action has accrued* . . . ." (Emphasis added.)

---

label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

. . . .

(11)(b)2. Any person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees. Any person suffering pecuniary loss because of a violation by any other person of any injunction issued under this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including reasonable attorney fees.

*Hansen* noted that the question of when the cause of action accrued is subject to several meanings, and held:

> In the interest of justice and fundamental fairness, we adopt the discovery rule for all tort actions other than those already governed by a legislatively created discovery rule. Such tort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first. All cases holding that tort claims accrue at the time of the negligent act or injury are hereby overruled.

*Id.* at 560, 335 N.W.2d at 583.

Later, *Kohnke v. St. Paul Fire & Marine Ins. Co.*, 144 Wis. 2d 352, 361, 424 N.W.2d 191, 195 (1988), explained: "The plain language of the *Hansen* case did not limit its discovery rule to certain type of cases, such as medical malpractice or products liability, but was applicable to any case not 'already governed by a legislatively created discovery rule.' "

The buyers argue that *Esser* is not persuasive. We need not address the argument. The published decision of any one of the panels of the court of appeals has binding effect on all panels. *In re Court of Appeals*, 82 Wis. 2d 369, 371, 263 N.W.2d 149, 149-50 (1978). Because *Esser* considered and interpreted virtually identical statutory language to that found here, the holding that *Hansen* does not apply is binding. This claim, therefore, was not timely made and must be dismissed.

### INTEREST ON LAND CONTRACT PRINCIPAL

Mrs. Skrupky maintains that she is entitled to interest on the unpaid balance of her land contract, citing *Estreen v. Bluhm*, 79 Wis. 2d 142, 255 N.W.2d

473 (1977). The parties stipulated to the calculation of the interest should it be allowed.

The allowance of interest, in cases of equity, is a matter of trial court discretion. *Id.* at 156, 255 N.W.2d at 481. *Estreen* reversed a trial court's denial of interest, holding:

> Although the allowance of interest depends upon the various equities in each case, the general principle followed in cases involving the enforcement of executory contracts for the purchase and sale of real property is that it is inequitable to permit either party, vendor or vendee, to enjoy both the beneficial use of the property and the use of the purchase money without being held accountable in some manner to the other.

*Id.*

That court also stated that "except in relation to a wrongful refusal to accept a satisfactory tender of payment, it is a misconception that fault is a critical factor in determining to whom and upon what amounts interest should be allowed." *Id.* at 157-58, 255 N.W.2d at 482.

*Estreen* is distinguishable on its facts. In that case, the evidence showed that the buyer was in possession of the land "and was accepting the benefits therefrom at all times [and] directly received all the rents from these properties." *Id.* at 156-57, 255 N.W.2d at 481. The court also noted that even if fault were a factor, the sellers were not at fault. *Id.* at 157-58, 255 N.W.2d at 482.

Here, the property was rendered largely unsuitable for the business for which it was purchased after the date contract payments were halted. Thus, the buy-

ers did not enjoy the benefits of the land. Further, while fault is not critical, it is not irrelevant. Because the loss of use of the land was directly related to the seller's fault in this case, the court did not erroneously exercise its discretion by denying interest.

In conclusion, that part of the judgment imposing liability is upheld; that part of the judgment awarding damages is affirmed in part and reversed in part; and the matter is remanded to the trial court for entry of a judgment consistent with this decision.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded. No costs to either party.