Francis H. Leggett & Company, Respondent, vs. West Salem Canning Company, Appellant.
Same, Appellant, vs. Same, Respondent.

*December 12, 1913—January 13, 1914.*

*Principal and agent: Acts in excess of authority: Disaffirmance: Contracts: When made: Preliminary negotiations: Sales.*

1. When an agent acts beyond or in excess of his authority, the principal will be bound by such act unless he disaffirms it within a reasonable time after knowledge thereof.
2. The evidence in this case is *held* insufficient to show disaffirmance by the defendant of the act of its agent in selling in forbidden territory.
3. Where a contract informal, but complete in its terms, appears to have been made, it will take effect and be binding notwithstanding the fact that the parties anticipate that a more formal contract will afterwards be made embodying the same terms.
4. But letters and telegrams between the parties will not be construed as a contract when it is plain that they were intended only as preliminary negotiations to be followed by a formal contract containing material provisions not contained in nor to be inferred from the preliminary letters or communications.
5. Where the terms of a contract are fixed and not ambiguous even proof of universal custom cannot change them.

Appeals from a judgment of the circuit court for La Crosse county: E. C. Higbee, Circuit Judge. *Reversed.*

Action for damages for breach of contract to sell and deliver 2,000 cases of canned peas known as "No. 4 Alaska peas" at eighty-five cents per dozen cans, there being two dozen cans in each case.

The defendant in June, 1911, operated a pea-canning factory at West Salem, Wisconsin, and the plaintiff was a wholesale grocery corporation at New York. The defendant at this time had an agent named Killian at New York who had the exclusive agency for the sale of its goods in New

York; H. C. Gilbert was a broker in canned goods at Indianapolis, under the name of H. C. Gilbert Company; and Johnston, North & Co. were brokers in canned goods at New York.

On June 10, 1911, Gilbert (who had previously sold one or two lots of canned peas for the defendant on commission) telegraphed to the defendant an offer to sell some of its canned goods in New York, and defendant replied that it had a broker in New York but that it had a "few futures left for your territory." June 13th Gilbert telegraphed, "Wire immediately list we can offer in our territory, we have one or two good prospects." June 14th defendant replied, "Have 2,000 cases four Alaska at ninety, usual freight allowance." June 15th Gilbert wired Johnston, North & Co. at New York, "We offer subject to goods being unsold 1,000 cases number four sweets, eighty cents, 2,000 cases fancy four Alaskas, eighty-five cents, f. o. b. Wisconsin," to which Johnston, North & Co. replied on the same day, *"Leggett will take thousand four sweets, eighty, Muncie, 2,000 four Alaskas, eighty-five, West Salem, approval samples both, merely wants to be protected, wire answer."* Also on the same day Gilbert telegraphed defendant, "Offered eighty-five f. o. b. for 2,000 fancy four Alaskas as per your wire fourteenth, also seventy-five f. o. b. for 2,000 sweets, wire answer," and to this the defendant replied on the 16th, "2,000 cases four Alaskas at eighty-five, f. o. b. factory, O. K." On the 16th also Gilbert telegraphed to Johnston, North & Co., "Confirm *Leggett* 2,000 cases fancy four Alaska, eighty-five cents, f. o. b. Salem." On June 15th Johnston, North & Co. wrote Gilbert the following letter:

"We have your wire offering 1,000 c-s No. 4 sweets at 80c f. o. b. Muncie and 2,000 c-s Fancy No. 4 Alaskas at 85c West Salem, Wis. Now Vallette of *F. H. Leggett & Co.'s* will take these two lots if we can show him samples of the goods or give him some kind of a contract that will cover him

on quality.    As far as the No. 4 fancy Alaskas go, why this can be covered in the contract, for we all know what a fancy No. 4 Alaska Pea is, Wisconsin Pack, but as far as the 1,000 c-s No. 4 Sweets, Indiana, it is pretty hard to describe the quality to a buyer and protect him.    See if you can tie these two lots up and advise us by wire."

On June 17th Gilbert wrote and sent to defendant the following letter which in the ordinary course of mail would reach West Salem on the 19th or early on the 20th of June, viz.:

"Referring to the 2,000 c-s Fancy No. 4 Alaska Peas you have confirmed to me, after confirming this to the buyer, it occurred to me that you wired me a few days ago that you had a broker in New York and I understood from this that you did not wish me to offer your peas in that city.    I had already confirmed these to *Francis H. Leggett & Company* before it occurred to me, and I hope under the circumstances it will be agreeable to you to accept a contract made out to *Francis H. Leggett & Company,* New York.    If, however, you are afraid this will get you into trouble, I will have the contracts made out to myself and then of course I can sell them to *Leggett* without interfering with your New York representative.

"Along this line, I would suggest that this question comes up very often with me in selling goods for packers.    The most of the packers take the position that their local representatives should not complain if I go into their markets and sell canned goods for them.    In other words, the local representative is presumed to be looking after the interests of said packer, and if he were doing this work conscientiously, any broker from an outside market could not get in there and sell his trade.    I do not think any local broker has a right to complaint when I go into his market and sell goods for a packer he represents direct because, as I have said before, if he were looking after your interests there, he would get the business instead of me getting it for you.    Please let me hear from you on this subject, and oblige."

This letter was not specifically replied to by defendant, unless a telegram and letter sent by defendant to Gilbert on

June 21st may be considered as replies. The telegram and letter referred to read respectively as follows: "The extremely hot weather has cut the crop short in this section and we are now sold up to the limit." After this telegram was received and on June 22d, Gilbert wrote defendant the following letter:

"Your telegram of the 21st received saying that you could not take on any more business for future peas. We inclose the contract for 2,000 cases No. 4 fancy Alaskas sold for you on the 16th. This contract has just gotten back signed by the buyer. Please sign the blue copy and return retaining the yellow copy for your files. Now, these people are shipping their labels but before you put the labels on the peas, they want you to send them a dozen cans of your peas so they can see just what the quality is. In other words, they want to determine whether the labels they are sending to you are the ones they want put on these peas or whether they will want to have them under another label. Just as soon as you can send them a dozen cans that will represent the peas that you will ship on this contract, ship the samples by express to Johnston, North & Co., New York, and mark them for *Francis H. Leggett & Co.,* and our associate brokers there will advise us in regard to the labels."

This letter was never replied to. On July 1st the defendant's office, with all of its correspondence, was consumed by fire. On July 3d Gilbert wrote reminding the defendant that it had not signed and returned the *Leggett* contract, also on July 7th, 12th, and 14th. To the last named letter the defendant replied as follows:

"We have had a fire that burned our office and we are trying to straighten things. We have not the contract you refer to if we have had it must burned. However, we will have our bookkeeper look the rest of our papers through, but do not think we have any contracts not signed for parties. We are nearly through with pack, will be able to fill our orders."

To this letter Gilbert replied on July 15th, inclosing a second copy of the contract for signature and requesting the

forwarding of samples.    On July 17th the defendant replied to this letter as follows:

"We have your letter of the 15th with contracts inclosed, which we herewith return as we are unable to fill it on account of the short crop.    We are sorry that we cannot fill this contract, but under the unfavorable condition of the weather it is impossible to fill any more contracts.    We assure you that if we have anything left after filling our futures we will notify you and give you a chance."

Other correspondence followed in which Gilbert still claimed that a valid contract existed, and on July 31st the defendant sent to Gilbert the following letter:

"We have your letters referred to in your letter of the 26th inst.    We do not consider ourselves under contract with *Francis H. Leggett & Co.*    We have a copy of your telegram on June 12th and our reply on the 16th simply stating what we had and at what prices.    We have accepted no order nor have we signed any contract with these people, but, however, if it is possible for us to accommodate you on this order later in the season, we will be pleased to do so.    The writer is familiar with all this transaction and the laws binding thereon.    We are not trying to shirk any contracts that we have made, nor do we propose to sign contract unless we can see our way clear to do so."

The circuit court ruled that the telegrams of June 15th and 16th constituted a contract for the sale of 2,000 cases of Alaska peas at eighty-five cents, and the only question for the jury was the question of damages.    In response to special questions the jury found that the market value of "fancy four Alaska peas" per dozen cans at West Salem, June 21, 1911, was eighty-five cents, on July 17th $1, and on August 1st $1.20.

Upon this verdict the court rendered judgment for the plaintiff for $600 with interest, being the difference between the market value of the peas on June 21st and on July 17th. The defendant appeals from the whole judgment, and the plaintiff appeals from that part thereof which limits the re-

covery of damages to the difference in market price which existed July 17th, instead of the difference which existed on August 1st.

For the plaintiff there was a brief by *Bunge & Bosshard,* and oral argument by *George W. Bunge.*

*J. E. Higbee,* for the defendant.

WINSLOW, C. J.    Clearly Gilbert was the agent of both parties, as middlemen generally are and properly may be. His function was simply to act as the means of communication between parties who made their own terms.    *Stewart v. Mather,* 32 Wis. 344, 355; *Orton v. Scofield,* 61 Wis. 382, 21 N. W. 261.    Probably no one would doubt that if the only facts appearing in evidence were that the plaintiff sent to the defendant a telegram offering eighty-five cents per dozen, f. o. b., for 2,000 cases fancy four Alaska peas, and that the defendant replied immediately, "$2,000 cases four Alaskas at eighty-five, f. o. b. factory, O. K.," there would have resulted a complete contract, which could be sued on by either party in case of breach.

At first glance this seems to be what was done here by the telegrams which were exchanged on June 15th and 16th between Johnston, North & Co., Gilbert, and the defendant. The defendant contends, however, that there are additional facts in the evidence which demonstrate that no binding contract was made or intended to be made by the telegrams. These additional facts are in brief (1) that the defendant never authorized Gilbert to sell any goods to a New York purchaser; (2) that the plaintiff authorized Gilbert to make no contract except a contract which contained a provision requiring the furnishing of samples; and (3) that it was contemplated by the parties that a formal written contract containing additional and materially different provisions should be signed by the parties later.

As to the first contention, it is shown that as early as

June 19th or 20th the defendant was fully informed that the sale had been in fact made to New York parties, and it is just as certain that the defendant never repudiated the sale on that account.

Where an agent acts beyond or in excess of his authority it becomes the duty of the principal to disaffirm the agent's act within a reasonable time after knowledge thereof or he will be bound thereby. *McWhinne v. Martin,* 77 Wis. 182, 46 N. W. 118; *Clews v. Jamieson,* 182 U. S. 461, 21 Sup. Ct. 845. The telegram and letter of June 21st are simply statements that the defendant can take no more contracts; they contain no hint that any contract already entered into is rescinded, or that Gilbert's act in selling to New York parties is repudiated. Even as late as July 17th the defendant writes Gilbert returning the proposed written contract simply because "we are unable to fill it on account of the short crop," and assures him that "if we have anything left after filling our futures we will notify you and give you a chance." It is true that in the letter of July 31st the defendant says that "we do not consider ourselves under contract with *Francis H. Leggett & Co.,*" but even here no claim is made that the contract was void because made with New York parties, but simply that "we have *accepted no order*" and signed no contract. In this last letter it seems very evident that the defendant's officers did not have before them Gilbert's telegraphic offer of June 15th and the unconditional acceptance thereof dated June 16th, as they refer only to "your telegram on June 12th and our reply on the 16th simply stating what we had and at what prices."

We reach the conclusion that the defendant did not disaffirm the contract within a reasonable time after the fact that their agent had entered forbidden territory was brought to their attention, and hence that the defendant's first contention fails.

The second and third contentions are very closely related and present more serious questions.

As to the furnishing of samples, it is admitted by plaintiff that Johnston, North & Co.'s telegram to Gilbert of June 15th authorized only a purchase conditioned on the approval of samples to be furnished by the seller, but it is said that this requirement was waived by the letter of the same date passing between the parties. This letter will be found quoted at length in the statement of the case and need not be repeated here. Its meaning is not so clear as might be desired, but if it be construed as waiving the furnishing of samples, that waiver is only to take place in case some clause guaranteeing the quality is inserted in the contract. The subsequent correspondence between Johnston, North & Co. and Gilbert (which it has not been thought necessary to print) shows beyond dispute that the plaintiff, Johnston, North & Co., and Gilbert expected that samples would be furnished in order that the plaintiff might judge of the quality. That this was Gilbert's idea is very clearly evidenced by his letter to the defendant of June 22d, which is quoted at length in the statement, and by a number of letters which followed it. So it seems certain that neither the plaintiff nor Gilbert understood that the demand for samples had been waived or made unnecessary by anything to be contained in the proposed written contract. This brings us naturally to the third contention. The law is quite well settled that where a contract informal, but complete in its terms, appears to have been made, it will take effect and be binding notwithstanding the fact that the parties anticipate that a more formal contract will be afterwards made embodying the terms of the informal contract. *Cohn v. Plumer,* 88 Wis. 622, 60 N. W. 1000.

It is equally well settled, however, that letters or telegraphic communications between the parties will not be con-

strued as a contract when it is plain that they were intended only as preliminary negotiations to be followed by a formal contract containing material provisions not contained in or to be inferred from the preliminary letters or communications.   *Lyman v. Robinson,* 14 Allen, 242, 254; *Moulton v. Kershaw,* 59 Wis. 316, 18 N. W. 172; *Hunter v. Hathaway,* 108 Wis. 620, 84 N. W. 996.

In the first case above cited it is said: "The question in such cases always is, Did they mean to contract by their correspondence, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up, and by which alone they designed to be bound?"

The evidence in the present case makes it entirely certain that both the parties to the transaction and the brokers expected that a formal written contract would be executed by the parties embodying in detail the terms of the sale.   If this written contract was expected to be simply a more formal document embodying only the terms expressly stated or necessarily implied in the telegrams, the fact that it was expected to be made might not be considered important, but the evidence conclusively shows that it was expected to contain terms not contained in or to be implied from the telegraphic communications.   Even if we were to ignore the fact that the plaintiff from start to finish insisted on the furnishing of samples or the embodiment of some clause guaranteeing quality in the contract, the evidence makes it clear that there was another material provision not contained in nor to be implied from the telegraphic messages which all parties expected would be included in the written contract, namely, the provision that in case of a short crop, fire, or other unavoidable accident the defendant would only be obliged to deliver seventy-five per cent. of the contract amount.

The evidence on the part of the defendant is undisputed that it never sold peas without a written contract, that it al-

ways embodied this clause in its written contracts, and that this was the universal custom among packers, brokers, and buyers of canned goods. It is certain that the broker, Gilbert, expected the written contract to contain this provision, because he inserted it in the contracts which he drew and sent to the parties for signature, as appears from his letter of July 18th. It appears also that the plaintiff entertained a like expectation, for it immediately signed and returned the contract which Gilbert forwarded to it on June 17th containing the seventy-five per cent. clause:

If the telegrams constituted a contract there could be no such allowance, because they call for the delivery of 2,000 cases absolutely, and where the terms of a contract are fixed and not ambiguous even proof of universal custom cannot change them. *Mowatt v. Wilkinson,* 110 Wis. 176, 85 N. W. 661.

These considerations seem to conclusively negative the idea that the telegrams were expected by either party to constitute the contract between them, but were simply regarded as the preliminary steps, to be followed by the furnishing of samples and the execution of a written contract by which only the rights of the parties were to be fixed. That contract never having been executed, the present action must fail.

*By the Court.*—Judgment reversed on the defendant's appeal, and action remanded with directions to enter judgment dismissing the complaint. The plaintiff takes nothing on its appeal. But one bill of costs is allowed.