**In re HARNISCHFEGER INDUSTRIES, INC., et al., Debtors.**

**No. 99–2171 PJW.**

United States Bankruptcy Court, D. Delaware.

May 16, 2003.

James H.M. Sprayregen, Anne Marrs Huber, Steven R. Kotarba, Kirkland & Ellis, Chicago, IL, Laura Davis Jones, Scotta E. McFarland, Kathleen Marshall DePhillips, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Wilmington, DE, Co–Counsel to the Reorganized Debtor.

Jonathan L. Parshall, Chase T. Brockstedt, Murphy Spadaro & Landon, Wilmington, DE, Howard Seife, Thomas J. Hall, Steven Rivera, Chadbourne & Parke LLP, New York City, for Rockwell International Corporation.

### MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion addresses debtor Harnischfeger Industries, Inc.'s ("HII") objection to Rockwell International Corporation's ("Rockwell") claim number 7082 (the "Claim"). HII asserts that the Claim is unenforceable under Wisconsin contract law and should be expunged pursuant to

11 U.S.C. § 502(b)(1).[1] *See* Doc. # 8455 at 7. Rockwell asserts that debtor Beloit Corporation, an HII subsidiary ("Beloit" and collectively with HII, "Debtors"), owed Rockwell for equipment purchases under prebankruptcy contracts and that following Beloit's breach of those contracts Beloit offered certain payment terms to Rockwell to satisfy the obligations. Rockwell contends that the parties created a binding contract upon Rockwell's acceptance of Beloit's payment terms and that HII guaranteed Beloit's performance of the contract. *See* Doc. # 12624 at 10–15. Alternatively, Rockwell requests that the Court apply the doctrine of promissory estoppel to allow the Claim. *See id.* at 21. HII characterizes the Beloit–Rockwell post breach communications as preliminary negotiations and asserts that neither party assented to a payment agreement outside of the previously existing contract obligation. *See* Doc. # 12382 at 9–10. HII rejects Rockwell's contention that a May 13, 1999 letter from Beloit to Rockwell constitutes an HII guarantee. *See* Doc. # 12682 at 22–26. For the reasons discussed below, I conclude that a binding payment plan never existed between Beloit and Rockwell because the parties never agreed on the essential terms of the payment plan. Absent an enforceable Beloit–Rockwell payment terms agreement, HII cannot be liable on any guarantee basis. Furthermore, I find that even if a payment terms agreement existed between Beloit and Rockwell, HII did not guarantee Beloit's performance thereunder.[2]

### BACKGROUND

Each party relies heavily on the business communications among the principal officers of HII, Beloit and Rockwell in support for their respective positions.

These communications provide the fact pattern associated with the negotiations and the outcome of this dispute rests on the interpretation of, and the weight assigned to, these communications. For convenience of reference each company's principal participants are as follows:

For HII:

John Hanson ("Hanson")—President, CEO and Chairman of the Board

Mark Readinger ("Readinger")—Senior Vice President (and also with Beloit)

For Beloit:

Mark Readinger ("Readinger")—President and director of Beloit

William Hackett ("Hackett")—Executive Vice President (Operations)

Robert Seidel ("Seidel")—Director of Purchasing

Bernard Sturgeon ("Sturgeon")—Purchasing Manager (Jacksonville, FL)

For Rockwell:

Robert Eisenbrown ("Eisenbrown")—Vice President (Drives Businesses)

Robert Van Lieshout ("Van Lieshout")—Manager, Forest Products Division

This contested matter results from Asia Pulp & Paper's ("APP") failed attempt to construct a paper plant in Perawang, Indonesia. In 1997, APP contracted with Beloit for paper processing machinery. Beloit, in turn, contracted with Rockwell for several component pieces Beloit needed for its APP project. Of the several purchase orders generated by Beloit and Rockwell, the parties only address PPM 4 and PPM 5 (collectively, the "Purchase Orders") in their pleadings.

APP's project ran into financial and construction difficulties and APP suspended its purchasing obligations under the

---

**1.** The Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* is hereinafter referred to as "§ ____."

**2.** This ruling does not affect Rockwell's breach of contract claim against Beloit.

APP–Beloit purchase orders.[3] At the time of suspension, Beloit had contracted with Rockwell, and Rockwell had already completed a substantial portion of its obligations to Beloit under the Purchase Orders. Neither APP nor Beloit initially informed Rockwell of APP's intention to suspend the APP–Beloit contracts. Beloit disclosed the suspension to Rockwell during a January 25, 1999 status meeting that addressed the progress of the Purchase Orders. At the meeting, Beloit requested cancellation figures for the Purchase Orders. Rockwell complied and advised that total cancellation charges were $23,825,403.00 for PPM 4 and $4,824,833.00 for PPM 5.[4] See Doc. # 12682, Ex. 2. Beloit did not definitively cancel the Purchase Orders until February 11, 1999. In a letter to Eisenbrown, Hackett stated that Beloit intended to "exercise[ ][its] contractual right to suspend work under the Purchase Order until further notice." See Doc. # 12624, Ex. 1; Doc. # 12682, Ex. 3.[5] The Purchase Orders only provided for cancellation and did not provide for a general suspension right. See Doc. # 12624, Ex. 18, at 9–11. Hackett asked Rockwell to investigate alternative uses for any completed machinery and also requested a meeting to negotiate payment terms. See Doc. # 12624, Ex. 1. The meeting would occur on May 4, 1999, after Beloit received and analyzed Rockwell's mitigation of damages alternatives.

On May 3, 1999, Sturgeon circulated possible payment plan terms to other Beloit employees in preparation for the Beloit–Rockwell meeting. See Doc. # 12624, Ex. 2. Sturgeon's proposal made the following assumptions: (1) that Beloit owed $2,824,833.00 on PPM 5; (2) that Beloit owed $20,864,244.00 on PPM 4; (3) cost of money or interest charges were not included; (4) the payments would begin November 1, 1999; and (5) storage costs were to be negotiated. See id. Sturgeon calculated that Beloit would satisfy PPM 5 in eight monthly payments of $353,104.00. PPM 4 would be paid in eighteen months, seventeen payments of $1,159,999.00 and a final $1,161,244.00 installment. See id.

Beloit presented Sturgeon's proposal toward the close of the meeting. See (Doc # 12624), Ex. 5, at 3. During the ensuing discussion, Rockwell stated that HII would be required to back Beloit's proposal with a parent guarantee. See id. The Beloit representatives promised to discuss the guarantee with HII personnel and provide Rockwell with an immediate answer.

Hackett coordinated Beloit's efforts to arrange for the guarantee and queried Readinger about the possibility of HII guaranteeing any Beloit–Rockwell payment agreement. See Doc. # 12624 at 7. Readinger told Hackett that Beloit should submit a guarantee request to HII after Beloit reached an agreement on the payment terms and to not "let [a guarantee] stand in the way of getting an agreement." See id. at 8. Hackett then telephoned Eisenbrown to inform him that HII would provide the guarantee if Beloit and Rockwell agreed to a payment plan. See id. at

---

**3.** According to deposition testimony and the pleadings, the APP–Beloit purchase orders contained a term allowing APP to temporarily suspend its obligations for up to one year.

**4.** Of these amounts, Beloit had already paid $2,961,159.00 toward PPM 4 and $961,169.00 toward PPM 5.

**5.** The Court will identify exhibits to Rockwell's Doc. # 12624 numerically in order to clarify Rockwell's pleadings and exhibits. Rockwell's electronic filing contained six unidentified "exhibits." However, eighteen separate exhibits are found within the six filed "exhibits." Attached hereto is an appendix which identifies the eighteen exhibits by reference to Rockwell's filed pleadings and exhibits.

9. Eisenbrown requested a written confirmation and on May 13, 1999, Hackett faxed a letter to Eisenbrown stating that HII would provide a guarantee "as part of the payment plan agreement." *See id.*

It was not until June 2, 1999 that Rockwell's Van Lieshout provided Seidel with Rockwell's proposed PPM 4 mitigation credits totaling $5,657,516. *See* Doc. # 12682, Ex. 12. Van Lieshout also notified Sturgeon that Rockwell would accept the payment plan as presented on May 4 with the addition of HII's guarantee. *See* Doc. # 12624 at 9. Eisenbrown purportedly faxed a draft payment agreement and a draft parent guarantee to Beloit on June 3, 1999. The cover letter requested that Hackett forward these drafts to Beloit's legal department for review. *See* Doc. # 12624 at 10; Doc. # 12682, Exs. 16–20. None of the Beloit officers recall receiving this letter. On June 7, 1999, Debtors filed voluntary petitions for chapter 11 relief in this Court.

## DISCUSSION

### Contract Claim

▮▮▮ HII asserts that pursuant to § 502(b)(1), the alleged guarantee agreement is unenforceable under applicable Wisconsin law and, therefore, the Claim must be expunged.[6] In Wisconsin, a contract is enforceable when a party proves that an offer, an acceptance and consideration exist. *See NBZ, Inc. v. Pilarski*, 185 Wis.2d 827, 520 N.W.2d 93, 96 (1994). Offer and acceptance can be demonstrated through "mutual expressions of assent." *See id.* The consideration element is satisfied if an intent to be bound is proved. *See id.*

▮▮▮ A valid contract requires "a meeting of the minds" and each party must to agree on the essential terms. *See Todorovich v. Kinnickinnic Mut. Loan & Bldg. Ass'n*, 238 Wis. 39, 298 N.W. 226, 227 (1941). "Vagueness or indefiniteness as to an essential term of the agreement prevents the creation of an enforceable contract...." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 557 N.W.2d 67, 75 (1996) (citations omitted). Indefiniteness and vagueness are contract formation issues that may be addressed directly by the Court as a matter of law. *See id.* In Wisconsin, "parties do not need to agree subjectively to the same interpretation at the time of contracting in order for there to be mutual assent.... [M]utual assent is judged by an objective standard, looking to the express words the party used in the contract." *See id.* (citations omitted).

▮▮▮ Courts are reluctant to impose contracts on parties still engaged in negotiations. However, Wisconsin courts will enforce oral and informal contracts as long as the terms are complete and even though a formal written contract is anticipated or pending. *See Francis H. Leggett Co. v. West Salem Canning Co.*, 155 Wis. 462, 144 N.W. 969, 972 (1914); *Van Slett Craftsmen v. C.W. Carlson Co.*, 562 N.W.2d 927, 1997 WL 58717, at *6 (Wis.Ct. App. Feb. 13, 1997) (unpublished opinion).

---

**6.** 11 U.S.C. § 502 states:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, ... objects.

(b) Except as provided ..., if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

Conversely, informal written or oral communications will not form a binding contract if the parties were still engaged in negotiations and they intend to be bound only by a formal written contract containing all material provisions. *See Leggett*, 144 N.W. at 972. The question I must address is: "Did [the parties] mean to contract by their correspondence, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up, and by which alone they designed to be bound?" *See id.*

 The record before me leads me to the conclusion that the dealings between Beloit and Rockwell never left the negotiation stage. On these facts neither party was entitled to believe that a payment agreement was binding. Absent a binding payment agreement, there is no basis to conclude the existence of a guarantee of such an agreement.

Essential terms were never resolved and the only evidence of specified material terms is a June 3, 1999 unexecuted draft payment agreement created by Rockwell. Eisenbrown's letter presented the drafts to Beloit and requested that Beloit's legal department review the documents. *See* Doc. # 12682, Ex. 16.[7] Eisenbrown also noted that Rockwell personnel would be available to answer questions and that Rockwell "look[ed] forward to a speedy resolution of these matters." *See id.* Rockwell's drafts amounted to nothing more than its view of agreed to terms. It seems clear that as sophisticated business persons, Beloit's and Rockwell's management would certainly require specific and unequivocal documentation before paying

on or receiving a $15 million to $20 million promise. Deposition testimony supports this conclusion. Readinger testified that Hackett could not bind Beloit to a particular payment scheme without management approval. *See* Doc. # 12624, Ex. 14, at 7. Rockwell's creation of the agreements also demonstrates that Beloit and Rockwell intended to bind themselves to the payment terms only after executing a formal, written agreement. In answering the question presented in *Leggett*, I conclude that Rockwell's attempted formalization and Beloit's requirement that management approve any deal undermines any notion that the parties intended to contract by their correspondence alone.

As of the bankruptcy petition filing, it seems clear that neither party accepted the same price terms. Beloit's proposed payment plan assumed PPM 4's cancellation required payments totaling $20,864,244.00 to be paid over 18 months. Rockwell's drafts quoted PPM 4's total outstanding balance as $15,206,728.00, also payable in eighteen months. Rockwell's quote, although more favorable to Beloit on its face, represents mitigation credits faxed to Beloit personnel on the same day Rockwell "accepted" Beloit's payment plan. Only one day after acceptance, Rockwell faxed its draft agreements containing the new price term to Beloit. Rockwell's hasty acceptance and drafting of the agreements appears to deny Beloit adequate opportunity to verify, question or negotiate changes to the mitigation credits as computed by Rockwell. Furthermore, even as to the draft payment agreement attached to Eisenbrown's June 3, 1999 letter the parties had not yet agreed on the

---

**7.** There is some discrepancy over whether the draft agreements were ever sent to Beloit. Beloit's officers testified that they had never seen Eisenbrown's letter or the draft agreements prior to discovery. As the result would not be altered, the Court has assumed that the drafts were received by Beloit for purposes of this opinion.

starting date for monthly installment payments.

■ Even assuming that Rockwell and Beloit reached an agreement on the payment terms, the evidence simply does not support Rockwell's assertion that HII guaranteed any such payment terms agreement. Aside from the fact that there is no evidence of a management decision by HII to authorize an appropriate officer of HII to issue such a guarantee, I find that the statements in the May 13, 1999 letter from Hackett to Eisenbrown and the June 3, 1999 letter from Eisenbrown to Hackett fundamentally undercut any argument by Rockwell that a parent guarantee exists.

The message given in Hackett's May 13, 1999 letter is simple and unambiguous: "This is to confirm that Harnischfeger will provide a corporate guarantee backing the APP payment plan that we presented to you in our meeting last week. Documentation supporting this will be provided as part of the payment plan agreement."

This letter shows that:

1. There is a reference to a payment plan that has not been finalized as between Rockwell and Beloit. How could HII guarantee an obligation that has yet to be specified?

2. The letter is from Hackett as an officer of Beloit. There is nothing in the letter to suggest that Hackett was exercising any authority as an officer of HII or that he received authority from an appropriate officer of HII.

3. The first sentence of the letter states that HII "will" provide a guarantee. If the June 13, 1999 letter constitutes the HII guarantee why does the letter express what HII proposes to do in the future? If the intended effect of the letter was to make a guarantee, the sentence would simply have read that Harnischfeger "does hereby" guarantee or words to that effect.

4. The last sentence states that "[d]ocumentation supporting this will" be provided. If the May 13, 1999 letter constitutes a guarantee then there is no need to state that there will be documentation evidencing such a guarantee.

The June 3, 1999 letter from Eisenbrown to Hackett clearly shows that the May 13, 1999 letter did not have the effect that Rockwell now asserts. The June 3, 1999 letter purports to transmit to Beloit the very documents (unexecuted) which were intended to result in agreements among the parties. In addition to forwarding "[p]roposed language" for change orders, the letter submitted to Beloit a "Draft Payment Agreement and Parent Guarantee". Actually, this is a reference to two separate documents. The letter requests that Hackett review each document and forward the draft agreements to Beloit's counsel. The letter advises that Rockwell personnel are available to discuss or to answer any questions. What is to discuss if the guarantee is already in effect? Finally, Eisenbrown states that "[w]e look forward to a speedy resolution of these matters." The clear implication of that sentence is that there was no resolution of the matters as of June 3, 1999. As to the guarantee, this implication is consistent with the statement of a Rockwell contract administrator in an internal report of May 20, 1999 that "Rockwell Automation *anticipates* receipt of a Parent Letter of Guarantee *from Beloit's parent corporation." See* Doc. # 12682, Ex. 10, at 9 (emphasis added).

Provisions in the proposed Parent Guarantee and the proposed Payment Agreement further confirms that there never existed an enforceable guarantee between Rockwell and HII. In the third "whereas"

clause to the Parent Guarantee it states: "[w]hereas, a condition precedent to the execution and delivery of the Payment Agreement is the execution and delivery by the Guarantor of this Guaranty." "Execution and delivery" are words connoting intent to be bound. The proposed Payment Agreement would not be as effective between Beloit and Rockwell absent execution by HII of the guarantee. As would be expected, the proposed Payment Agreement recites that a condition to Rockwell's entering into the Payment Agreement is execution by HII of the proposed Parent Guarantee.

Several other provisions of the draft Guarantee Agreement are worth noting. Section 6.7 of the proposed Parent Guarantee relates to HII's solvency and recites that "[t]he Guarantor is, and after the execution and performance of the Guaranty will continue to be, solvent and able to pay its respective debts as they mature." Given the fact that HII and Beloit filed their Chapter 11 petition within days of the June 3, 1999 letter it seems doubtful that HII could have made such a representation. Section 6.8 makes reference to HII's delivery to Rockwell of audited financial statements as of a "blank" date. Thus, even as to the proposed Parent Guarantee document the complete terms had not been finalized.

### Statute of Frauds

■ Rockwell asserts that Hackett's May 13, 1999 letter is a writing sufficient to satisfy the statute of frauds. *See* Doc. # 12624 at 15. Even if the May 13, 1999 letter could be construed as an unequivocal statement of a guarantee, as discussed below, there is no basis to conclude (a) that Hackett was acting as an authorized agent for HII or (b) that Rockwell reasonably believed Hackett was such an agent. Thus, there is no HII writing satisfying the statute of frauds requirement.

### Promissory Estoppel

■ Rockwell argues that "[e]ven if the statute of frauds were not satisfied, HII would still be liable on its guarantee commitment based on principles of promissory estoppel." Doc. # 12624 at 21. Wisconsin law defines promissory estoppel as:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267, 275 (1965) (adopting Restatement (Second) of Contracts § 90 (1981)). I address two basic issues: (1) reasonableness of the reliance and (2) detriment.

Did Rockwell reasonably rely on Hackett's authority to bind HII? I find that it clearly did not.

■ I need to determine whether Hackett had actual or apparent authority to provide Rockwell with a guarantee. "Authority can be created in any way in which a person can manifest consent to another...." *Skrupky v. Elbert*, 189 Wis.2d 31, 526 N.W.2d 264, 269 (1994). An agent's express actual authority will be found in the contract between the principal and the agent. *See id.* Implied actual authority results when the agent, and not a third party, reasonably believes he has authority based on the principal's actions. *See id.* With apparent authority, a principal is liable when "the acts of one who reasonably appears to a third person, through acts by the principal or acts by the agent if the principal had knowledge of those acts and acquiesced in them, to be authorized to act as an agent for the prin-

cipal." *See Pamperin v. Trinity Mem'l Hosp.*, 144 Wis.2d 188, 423 N.W.2d 848, 853 (1988).

### Actual Authority

 Hackett possessed neither expressed nor implied actual authority to issue an HII guarantee. Documents in the record confirm that the power to issue a parent guarantee did not reside in any of HII subsidiaries or their officers. *See* Doc. # 12624, Ex. 9; Doc. # 12682, Ex. 24. The Omnibus Parent Guarantee Resolution, adopted by HII's Board of Directors on October 16, 1996, recognized guarantee letters only if authorized by the following HII officers: Chairman, Chief Executive Officer, President, any Executive Vice President and the Treasurer. *See* Doc. # 12624, Ex. 9, at ¶ 1. Hackett did not hold any position in HII and lacked any expressed authority to issue a guarantee.

Hackett also lacked implied authority to issue a guarantee. Based on his knowledge of the omnibus resolution and on conversations occurring during the Beloit–Rockwell negotiations, it would have been unreasonable for Hackett to assume he had authority to issue a guarantee. Deposition testimony bears this out. Hackett acknowledged discussing a parent guarantee with Readinger and possibly with Hanson. *See* Doc. # 12624, Ex. 12, at 57. Hackett also commented that he understood no guarantee would be delivered by HII unless "an agreed plan [was] basically executed first." *See id.* at 58. Hanson testified that even though he had authority to provide corporate guarantees, any guarantees were reviewed and approved by HII's CEO and CFO. *See* Doc. # 12624, Ex. 13, at 31. Finally, Readinger testified that Hackett's authority extended to negotiating new payment terms but did not grant him the authority to bind Beloit to any agreement. *See* Doc. # 12624, Ex. 14,

at 17. Regarding a guarantee, Readinger recalled that (1) he and Hackett discussed the issuance of a guarantee; (2) Beloit would present only a detailed and complete agreement to HII for consideration; and (3) that he told Hackett not to let the issue of a parent guarantee hold up negotiations. *See id.* at 20.

This testimony clearly shows that Hackett could not have reasonably assumed that HII had impliedly authorized him to issue an HII guarantee. Furthermore, Hackett's testimony reflects his understanding that a guarantee would be issued only on condition of a finalized payment agreement. Rockwell's contention that Hackett possessed actual authority to issue the guarantee is simply not supported by the record.

### Apparent Authority

 Rockwell maintains Hackett was the apparent agent of HII and that the guarantee is binding as presented to Eisenbrown by the May 13, 1999 letter. I disagree. Rockwell must establish Hackett's apparent agency by clearly showing: (1) an act by the agent or principal justifying belief in the agency; (2) knowledge thereof by the party sought to be held; and (3) reliance thereon by the plaintiff, consistent with ordinary care and prudence. *See Silberman*, 218 N.W.2d at 733; *Pamperin*, 423 N.W.2d at 854.

 Rockwell does not point to any specific HII conduct authorizing Hackett's alleged promise or HII's acquiescence after Hackett made the alleged promise. It is important to note that Rockwell received a duly authorized HII guarantee in connection with a transaction wholly unrelated to the dealings at issue here. Rockwell received a letter from Somerset R. Waters, HII's vice president and treasurer, on April 27, 1999. In this letter, HII agreed to guarantee any indebtedness owed to Reliance Electric (a division of Rockwell)

by HII's subsidiary Joy Technologies, Inc. *See* Doc. # 12682, Ex. 26. Rockwell received this letter less than one month before Eisenbrown received Hackett's May 13, 1999 letter. The Waters and Hackett letters are markedly dissimilar. Unlike Hackett's letter, the guarantee issued by Somerset R. Waters contains multiple paragraphs, is presented on HII stationary and is signed by a Beloit officer authorized to provide guarantees. Waters' guarantee is a sophisticated financial document with formalized terms, including an expiration date, restrictions and a total guarantee amount. *See id.* Hackett's May 13, 1999 letter lacks all of this detail and formality. Comparing these two letters, it seems clear that Hackett's letter is insufficient to imply the existence of apparent authority.

As shown in deposition testimony, HII management lacked knowledge of Hackett's letter. Although they engaged in discussions regarding a guarantee, Hanson and Readinger testified that a guarantee would not be issued unless Beloit and Rockwell reached a complete payment agreement satisfactory to all involved. *See* Doc. # 12624, Ex. 12, at 58 (Hanson deposition); Doc. # 12624, Ex. 14, at 20 (Readinger deposition). This testimony is entirely consistent with Rockwell's "condition" provision in the proposed Parent Guarantee as discussed on page 14 above. Hackett lacked authority, express, implied or apparent, to issue a guarantee and Rockwell's alleged reliance on Hackett's authority to issue the guarantee was unreasonable.

### *Detrimental Reliance*

▆▆▆ Rockwell asserts that in relying on the alleged representation by Hackett in the telephone conversation of May 13, 1999 and Hackett's May 13, 1999 follow up letter, it was injured because it "abstained from pursuing its legal right to collect on the debt immediately." *See* Doc. # 12624, at 21. This assertion has no substance. The Debtors filed their bankruptcy petitions on June 7, 1999. It is inconceivable that Rockwell could have commenced a collection action against Beloit, obtained a judgement and collected on that judgement within the 25 day period between the May 13 letter and June 7 automatic stay order resulting from the bankruptcy petition. Indeed, under Wisconsin law a defendant has up to 45 days just to respond to a complaint. *See Wis. Stat. Ann.* § 802.06 (West 2003)

### CONCLUSION

For the forgoing reasons Rockwell's guarantee claim is disallowed.

### APPENDIX

This appendix is intended to clarify Rockwell's exhibits attached to its Memorandum in Opposition to Debtors' Objections Seeking to Expunge Claim No. 7082 Filed By Rockwell International Corporation (Doc. # 12624). Rockwell identified seven exhibits on the first page of its memorandum but attached at least eleven additional exhibits when filing the memorandum. Rockwell's exhibits referenced in the Memorandum Opinion are as follows:

Exhibit 1 First page following Rockwell's memorandum. Letter Dated February 11, 1999 from William Hackett of Beloit to Robert Eisenbrown of Rockwell.

Exhibit 2 Second page following Rockwell's memorandum. E-mail from Bernie Sturgeon regarding Rockwell Automation Proposed Payment Plan with attached calculations.

| | |
|---|---|
| Exhibit 3 | Fourth page following Rockwell's memorandum. Agenda. |
| Exhibit 4 | Fifth page following Rockwell's memorandum. E-mail dated May 5, 1999 from Robert Seidel regarding Beloit's offer for a new payment plan. |
| Exhibit 5 | Sixth page following Rockwell's memorandum. Meeting minutes from May 4, 1999 meeting between Beloit and Rockwell Representatives. |
| Exhibit 6 | Ninth page following Rockwell's memorandum. Letter dated May 13, 1999 from William Hackett to Robert Eisenbrown regarding Harnischfeger's parent guarantee. |
| Exhibit 7 | Tenth page following Rockwell's memorandum. Facsimile dated June 2, 1999 from Bob Van Lieshout to Robert Seidel regarding PPM 4 revised order total. |
| Exhibit 8 | Twelfth page following Rockwell's memorandum. PPM 4 revised order total with Robert Seidel's handwritten notes. |
| Exhibit 9 | Thirteenth page after Rockwell's memorandum. Omnibus Parent Guarantee Resolution dated October 16, 1996 by the Board of Directors of Harnischfeger Industries, Inc. |
| Exhibit 10 * | Excerpts from the deposition of Francis Corby. |
| Exhibit 11 * | Excerpts from the deposition of Robert Eisenbrown. |
| Exhibit 12 * | Excerpts from the deposition of William Hackett. |
| Exhibit 13 * | Excerpts from the deposition of John Hanson. |
| Exhibit 14 * | Excerpts from the deposition of Mark Readinger. |
| Exhibit 15 * | Excerpts from the deposition of Robert Seidel. |
| Exhibit 16 * | Excerpts form the deposition of Bernard Sturgeon. |
| Exhibit 17 | Purchase Order No. 43B07–LP5 dated September 30, 1997. |
| Exhibit 18 | Terms and Conditions of Purchase, dated July 21, 1997, between Reliance Electric division of Rockwell Automation and Beloit. |

* These exhibits were identified as numbered by Rockwell on the first page of its memorandum in opposition.

## ORDER

For the reason set forth in the Court's Memorandum Opinion of this date, Harnischfeger Industries, Inc.'s objection (Doc. # 8455) to Rockwell International Corporation's claim number 7082 is **SUSTAINED** so that Rockwell International Corporation's claim number 7082 against Harnischfeger Industries, Inc. is **DISALLOWED**.